221 P.3d 452

ALVAREZ FAMILY TRUST; Sergio
S. Alvarez and Margaret J. Alvarez,
Petitioners/Plaintiffs–Appellants

v.

ASSOCIATION OF APARTMENT OWN-
ERS OF the KAANAPALI ALII, Re-
spondent/Defendant–Appellee

and

John Does 1–100; Jane Does 1–100; Doe
Partnerships 1–100; Doe Corporations
1–100; and Doe Entities 1–100, Defen-
dants.

No. 27695.

Supreme Court of Hawai'i.

Dec. 11, 2009.

Terrance M. Revere (Rebecca A. Szucs, with him on the application) of Motooka Yamamoto & Revere, Honolulu, for petitioner/plaintiffs-appellants, on the application.

Matt A. Tsukazaki (of Li & Tsukazaki), Honolulu, for respondent/defendant-appellee, on the response.

MOON, C.J., NAKAYAMA, ACOBA, and DUFFY, JJ., and Circuit Judge NISHIMURA, Assigned by Reason of Vacancy.

## OPINIONS OF THE COURT

Petitioners/Plaintiffs–Appellants Alvarez Family Trust, Sergio S. Alvarez and Margaret J. Alvarez (Petitioners) brought an action in the circuit court of the second circuit (the court)[1] claiming (1) that a vote taken by the Board of Directors (the Board) of Respondent/Defendant–Appellee Association of Apartment Owners of the Kaanapali Alii (Respondent or the Association) at a January 30, 2004 meeting, did not validly "approve," pursuant to Henry M. Robert, III, et al., *Robert's Rules of Order, Newly Revised* (10th ed. 2000) (*Robert's* or *Robert's Rules of Order*) and the voting requirement set forth in the Association's "Restatement of By–Laws" (the By–Laws), a "pricing policy" setting the price at which the Association would sell its leased fee interests to its members, and (2) that the Association, in realizing a profit in its sales of leased fee interests pursuant to the said pricing policy, violated, *inter alia*, the prohibition in the By–Laws on "conduct[ing] an active business for profit" and exceeded the powers conferred upon the Association by Hawai'i Revised Statutes (HRS) chapter 514C (1993 & Supp.2004). In its December 14, 2005 final judgment, the court granted summary judgment in favor of Respondent and against Petitioners. Petitioners filed an application for writ of certiorari (Application) on February 17, 2009 in this court, seeking review of the judgment of the Intermediate Court of Appeals (the ICA), filed on December 3, 2008, pursuant to its November 21, 2008 Summary Disposition Order (SDO)[2] affirming the court's final judgment. *See Alvarez Family Trust v. Ass'n of Apt. Owners of the Kaanapali Alii,* No. 27695, 2008 WL 4958487 at *3 (App. Nov. 21, 2008).

1. The Honorable Joseph E. Cardoza presided.

2. The SDO was filed by Presiding Judge Corinne K.A. Watanabe and Associate Judges Craig H. Nakamura and Alexa D.M. Fujise.

3. HRS § 514A–82(a)(16) states that "[a]ll association and board of directors meetings shall be conducted in accordance with the most current edition of *Robert's Rules of Order.*"

4. According to *Robert's,* "a quorum in an assembly is the number of voting members [ ] who must be present in order that business can be

## PART I:  VALIDITY OF THE VOTE ON THE PRICING POLICY

(By:  Acoba, J., with whom all justices concur)

It is concluded unanimously that (a) the By–Laws, which state that "action by a majority of directors present at any meeting" constitutes "action by the Board," require that directors abstaining from a vote be counted as present for purposes of determining whether a majority of the Board directors "present" at a meeting have acted, pursuant to *Robert's Rules of Order* as mandated by HRS § 514A–82(a)(16) (Supp. 2003),[3] and (b) inasmuch as when the Board voted on the pricing policy at the January 30, 2004 meeting, of seven directors present at the meeting, two abstained and only three voted in favor, the pricing policy was not validly adopted.

### A.

#### 1.

Petitioners are leasehold owners of an apartment at the Kaanapali Alii condominium on the island of Maui. The Association is governed by the By–Laws and the "Restatement of Declaration of Horizontal Property Regime of Kaanapali Alii" (the Declaration).

The By–Laws state that "[t]he affairs of the Association shall be governed by a Board of Directors composed of seven (7) persons." As to the Board's meetings, Article IV, Section 9 of the By–Laws states that "[a]t all meetings of the Board of Directors a majority of the total number of directors shall constitute a quorum[4] for the transaction of business, and *action by a majority of the directors present at any meeting* at which a

legally transacted. The quorum refers to the number of such members present, not to the number actually voting on a particular question." *Robert's Rules of Order* § 40 at 334.

Article IV, Section 9 of the By–Laws defines a quorum for the transaction of business at all meetings of the Board as "a majority of the total number of directors." Because Article IV, Section 1 of the By–Laws requires that the Board be composed of seven directors, a quorum under the Association's By–Laws is a majority of seven, or four directors.

quorum is present shall constitute action by the Board." (Emphasis added.) Article IV, Section 11 of the By–Laws provides that "*[n]o director shall vote* or cast a proxy vote at any Board meeting *on any matter in which he or she has a conflict of interest.*" (Emphases added.) Additionally, as stated *supra,* HRS § 514A–82(a)(16) states that "[a]ll association and board of directors meetings shall be conducted in accordance with the most current edition of *Robert's Rules of Order.*"

At a July 23, 2003 meeting of the Board, Bob Gordon (Gordon), the Board's President, informed the Board that the Hawaii Omori Corporation/Royal Kaanapali Joint Venture (the Lessor), the owner of the remaining leased fee interests at Kaanapali Alii, was planning to sell its interests. The Board voted unanimously to establish a committee, chaired by Bill Fontana (Fontana), a former Board President, to "obtain the lease to fee interests on behalf of the individual unit owners who have not purchased their fee interests."[5] At some point, Fontana formed Nohea Kai, LLC, which submitted its own offer to the Lessor to purchase the leased fee interests. Apparently, Gordon and another Board member were "considering becoming investor-members in Nohea Kai, LLC."

Subsequently, at an October 17, 2003 meeting, it appeared that the Board voted on whether to allow Nohea Kai, LLC to purchase the leased fee interests, or to acquire the leased fee interests itself.[6] Gordon and the other Board member "recused" themselves from this vote due to their "conflict." At the October 17, 2003 meeting, "the Board, excluding the two conflicted Board members, unanimously approved a motion to seek the approval of owners to authorize the Association to acquire leased fee interests on behalf of the Association as a whole."

Pursuant to this decision, on November 3, 2003, a letter was sent on behalf of the Association to the owners (including Petitioners) of Kaanapali Alii, informing them that the Board sought to exercise the Association's right of first refusal to purchase the remaining leased fee interests at Kaanapali Alii. The letter contained a proposed amendment to the Declaration (Declaration Amendment) that had been submitted to the Board so as to "allow the Board to exercise the right of first refusal[.]"

In pertinent part, the Declaration Amendment contained the following language:

(b) *Authority Pursuant to Chapter 514C, [HRS].* Notwithstanding any other provision contained in the Declaration or the By–Laws to the contrary and in addition to any other powers set forth herein or elsewhere therein, the Board of Directors shall have the power set forth in Chapter 514C, [HRS], to purchase or otherwise acquire, own, improve, use, and deal in and with the Leased Fee Interest or any or all undivided interests therein pursuant to a right of first refusal or a voluntary sale[.]

. . . .

(c) *Administration of Interests Acquired by Association.* In the event that the

---

**5.** Unless otherwise indicated, quotes are from the Application and briefs of the parties.

**6.** HRS chapter 514C provides Associations of Apartment Owners with a "right of first refusal" to purchase "the leased fee interest in land under a condominium project" from the seller. HRS § 514C–2 (1993) provides that

[w]hen the leased fee interest in land under a condominium project or cooperative project or any part thereof is to be sold to any party other than the association of owners or the cooperative housing corporation, the seller shall first provide the board of directors of the association of owners or the cooperative housing corporation with written notice delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to any two of the president, vice-president, or managing agent (if any), of its intent to sell that interest,

together with a complete and correct copy of the purchaser's written offer, which offer shall contain the full and complete terms thereof. *The association of owners or cooperative housing corporation shall have a right of first refusal to purchase that leased fee interest for the same price as is contained in the written purchase offer.* (Emphasis added.)

HRS § 514C–6(a) (1993) entitled "Powers of association of apartment owners and cooperative housing corporation," states in relevant part that "[t]he association of owners or cooperative housing corporation may purchase the leased fee interest in the land; provided that at least seventy-five per cent of the condominium unit lessees or cooperative unit lessees approve of the purchase."

Association acquires all or any portion of the interests of the Lessor, *the Board shall be empowered to take all such action as it deems necessary or appropriate to administer the interest(s) so acquired, including but not limited to* setting, arbitrating, and collecting lease rents, and selling and/or conveying all or any portion of such interest(s) upon such terms and conditions, including but not limited to price, *as the Board deems appropriate under the circumstances,* by such conveyance instruments as the Board deems appropriate. (Emphases added.)

In a section entitled "Recommendation of the [Board,]" the letter stated that "[i]f the Association does not purchase the remaining leased fee interests, another buyer . . . might increase prices *beyond the level that would be set by the Association to produce a reasonable profit to the Association.*" (Emphasis added.) Additionally, the letter stated that "*[t]here is the potential for the Association to make a 'profit' on the sale of the leased fee interests to the remaining lessees.*" (Emphasis added.) Article IV, Section 10(O) of the By–Laws provides that "[n]othing herein contained shall be construed to give the Board of Directors authority to conduct an active business for profit on behalf of the owners, or any of them, or the Association."

Petitioners do not dispute that by "January 20, 2004, owners representing more than 75% of the common interest had voted in favor of the exercise of the right of first refusal. In this total, 54 of the 68 lessees or 79% of the lessees voted in favor of the exercise of the right of first refusal." Among those voting in favor of the Declaration Amendment were Petitioners.

At a January 20, 2004 meeting, Board member Peter Mazula (Mazula) "reported on the leased fee conversion. He indicated that the Declaration amendment to allow the Association to exercise its right of first refusal had been approved by owners holding more than 75% of the common interest, the ballot tally had been verified and the amendment was being recorded." Mazula then moved to allow the Association to exercise its right of first refusal. The Board voted on this motion, and the "[m]otion [was] unanimously approved."

Subsequently, at the subject January 30, 2004 meeting, Mazula "reported that the owners had approved the right of first refusal Declaration Amendment and that the Board had exercised the right of first refusal to purchase the remaining 68 leased fee interests from [the Lessor] at a purchase price of $5,975,000." The Board voted unanimously to approve a Borrowing Resolution to authorize the Board "to borrow the sum of up to $6.2 million plus such additional amounts as the Board determines are necessary to effectuate the acquisition of the leased fee interest in Kaanapali Alii[.]" The Board then "discussed pricing and funding policies for leased fee resales to the leasehold owners." During the discussion, Mazula "noted that the Association intends to pass through to the purchasing leasehold owners all of its transaction and carrying costs, including any increases in interest expense due to interest rate resets under the loan." As to pricing of leased fee interests, Mazula made the following motion at the meeting:

The Board shall make the leased fees available for sale to leasehold owners *at a market reference price equivalent to the prices at which the leased fees were being sold to individual leasehold owners by [the Lessor], adjusted to reflect common interest differences and to bring them current as of the date the Association's bulk purchase closes.* The initial base prices shall be escalated 5% each year thereafter. Adoption of this pricing policy [7] is conditioned upon a review for reasonableness by an independent real estate appraiser. The Association shall also charge each purchasing leasehold owner a ratable share of the Association's transaction costs, carrying

7. Petitioners do not identify the specific terms of the Association's "pricing policy" that they are challenging. However, because they argue that "all seven Board members were present at the January 2004 Board meeting at which the voting took place on the pricing policy[,]" it is assumed that they are referring to the pricing policy discussed above in the motion voted on by the Board.

costs and other leased fee conversion costs incurred through the date of sale.

(Emphasis added.)

On this motion regarding the pricing policy, Gordon and two other directors voted "for" it, two directors voted "against," and two directors "abstain[ed]." In other words, out of the seven directors who were present at the meeting, five voted, with three voting in favor, and two voting against, the pricing policy. The two Directors who abstained from voting did so due to conflicts of interest "as leasehold owners." [8] The Board then deemed the pricing policy "approved."

### 2.

On January 11, 2005, Petitioners brought suit against Respondent, seeking (1) "[a] declaration that their fee interest be sold to them at the cost at which it was acquired[,]" (2) "[j]ust compensation including special, general, and punitive damages[,]" (3) "[a]n award of attorneys' fees, costs, and interest[,]" (4) "[c]ompensation for all lease rent paid to the Association before the fee is conveyed to [Petitioners,]" and (5) "[s]uch other and further relief as may be ordered by the [c]ourt."

On June 23, 2005, Petitioners filed a motion for partial summary judgment (partial summary judgment motion). In their partial summary judgment motion, Petitioners sought (1) "to obtain a declaration that three members voting in favor of a pricing policy does not establish the majority required of the seven-member [Association] Board[,]" [9] and (2) "an order by summary judgment prohibiting the [Association] from making a profit from the sale of the fee interest to [Petitioners'] leasehold apartment at the Kaanapali Alii under HRS [chapter] 514A, HRS [chapter] 514C, the [Association's] governing documents, the non-profit corporation act (HRS [chapter] 414D) and under the common law."

On August 25, 2005, Respondent filed its motion for summary judgment. In its motion for summary judgment, Respondent argued that (1) "[b]ased on the undisputed material facts, the [c]ourt should hold that the Association's sale of the remaining leased fee interests under its pricing policy was not a violation of [HRS c]hapter 514C[,]" (2) that "[t]he pricing policy was approved by the Board by vote of the majority of the members in attendance[,]" and (3) that Petitioners "are estopped from complaining about the pricing policy because they also voted in favor of the Board's authority to set the sale prices on the leased fee interests."

On September 8, 2005, the court issued an Order Denying Petitioners' Motion for Partial Summary Judgment (First Order). In its First Order, the court adopted verbatim the list of "undisputed material facts" set forth by Respondent in its memorandum in opposition to Petitioners' partial summary judgment motion, filed on July 25, 2005, stating that

[b]ased upon the undisputed material facts and the law[,] ... partial summary judgment is hereby granted in favor of [Respondent] and against [Petitioners] as follows:

1. [HRS] § 514C–22(d) and Part II of Chapter 514C, HRS, are not applicable to the Association's exercise of its right of first refusal under HRS § 514C–2 and Part I of Chapter 514C;

2. The pricing policy for the sale of the leased fee interests does not violate Chapter 514C, the amended Declaration or the By–Laws;

3. The Amended Declaration, By–Laws, and HRS § 414D–19, do not prohibit the Association from possibly generating a profit in the sale of the leased fee interests to the lessees;

4. Nothing in Chapter 514C, nor in HRS §§ 514C–2 or –6 or HRS § 514C–22(d),

---

**8.** There does not appear to be any further explanation as to why these directors abstained, and Petitioners do not argue that the abstentions were invalid.

**9.** Petitioners appeared to seek *partial* summary judgment because they believed that there was a

genuine issue of material fact as to the vote on the pricing policy. As discussed *infra*, however, no genuine issue of material fact exists as to the vote, and thus, summary judgment on this matter is appropriate.

prohibits the Association from possibly generating a profit in the sale of the leased fee interests to the lessees; and

5. [Petitioners] voted in favor of the amendment to the Declaration, and thus, are estopped from challenging the Association's exercise of the right of first refusal and the adoption of its current pricing policy as authorized by the amended Declaration and as approved by the Board.

On October 20, 2005, the court issued an Order Granting Respondent's Motion for Summary Judgment on the Association's Exercise of its Statutory Authority Under HRS § 514C–2 and its Authority to Set the Sale Prices of the Leased Fee Interests (Second Order). In relevant part, the court stated that summary judgment was granted in favor of Respondent and against Petitioners on all of Petitioners' cases. The court determined that the Second Order "resolves any and all issues and claims alleged by [Petitioners] ... on the formation and adoption of the [p]ricing [p]olicy." On December 8, 2005, the court issued an Order Granting Respondent's Motion for the Award of Attorney's Fees and Costs (Third Order), because Respondent was the "prevailing party." On December 14, 2005, the court "entered its final judgment ..., finding in favor of Respondent and against Petitioners as to all claims in the amount $15,839.68."

### 3.

On appeal the ICA affirmed the court's judgment. *Alvarez*, 2008 WL 4958487, at *3. As recounted by Petitioners, the ICA held "that the Kaanapali Alii Board validly approved the pricing policy, that neither the

Association's By–Laws nor HRS [c]hapter 514C prevent making a profit on the purchase of the fee interests, and that the [court] did not abuse its discretion in awarding attorneys' fees and costs[.]"

### B.

▮▮ Petitioners list the following questions in their Application:

[1]. Whether the ICA erred by determining that the [Board] validly approved the pricing policy.

[2]. Whether the ICA erred by determining that neither [Respondent's] By-laws nor HRS [c]hapter 514C prevent making a profit on the purchase of the fee interests.

[3]. Whether the ICA erred by determining that [the court] did not abuse its discretion in awarding attorneys' fees and costs to [Respondent].

On February 20, 2009, Respondent filed a memorandum in opposition (Response). On March 6, 2009, Petitioners filed a "Reply to [Respondent's] Response to Petitioners' Application" ("Reply"). However, nothing in Hawai'i Rules of Appellate Procedure (HRAP) Rule 40.1 permits a party to file a "Reply." [10] Although HRAP Rule 40.1(i) allows a party to "move in the supreme court for permission to file a supplemental brief," Petitioners did not do so as required by the rule. Thus, Petitioners' "Reply" is not considered in this opinion.

### C.

The ICA held as to the first question and in regard to Gordon's alleged conflict of in-

---

10. HRAP Rule 40.1, entitled "Application for Writ of Certiorari in the Supreme Court," states in pertinent part:

(a) **Application; When Filed.** No later than 90 days after filing of the [ICA's] judgment on appeal or dismissal order, any party may apply in writing to the supreme court for a writ of certiorari.

    ....

(e) **Response; form.** Within 15 days after the filing of an application for a writ of certiorari, any other party to the case may, but need not, file and serve a brief written response containing a statement of reasons why the application should not be accepted.

    ....

(i) **Review by supreme court after acceptance of application for a writ for certiorari.** If the supreme court accepts the application for a writ of certiorari, the case shall be decided on the record and the briefs previously filed. The supreme court may limit the question on review, may request supplemental briefs, and may set the case for oral argument. Within 10 days after the acceptance of the application for a writ of certiorari, a party may move in the supreme court for permission to file a supplemental brief. The court may impose restrictions as to length and filing of such brief and any response thereto.

(Boldfaced font in original.)

terest in voting on the pricing policy that (1) "[t]he By–Laws of the Association prohibit voting by a director with a conflict of interest[,]" (2) "[a] '[c]onflict of interest ... means an issue in which a director has a direct personal or pecuniary interest not common to other members of the association[,]' [HRS] § 514B–125[ (f) ] (2006 [Repl.] )[,]" [11] (3) "Gordon's conflict ... arose only insofar as he was involved with the entity that offered to purchase the leased-free [sic] interests from the condominium's developer," (4) "[o]nce the Association and the Board voted, with Gordon recused, to exercise that right to purchase the leased-fee interests, Gordon's interest in that entity was no longer in conflict with the Association's interests[,]" (5) "Gordon properly participated in the later, pricing-policy vote." *Alvarez*, 2008 WL 4958487, at *1 (first ellipses in original) (footnote omitted).

The ICA held as to the first question and in regard to the Board vote that (1) "[t]he By–Laws require Board action to be approved by a majority of directors present at a meeting with a quorum[,]" (2) "HRS § 514A–82[ (a) ](16) (Supp.2003) required that board meetings conform to *Robert's Rules of Order* [,]" (3) "*Robert's Rules of Order* [§ 44 at] 387[ ] excludes 'blanks or abstentions' when calculating a majority[,]" (4) "*[b]ecause two directors 'abstained,' their votes were correctly not counted in tallying the vote of three in favor and two against the [p]ricing [p]olicy[,]* " (5) "[t]hus, the [p]ricing [p]olicy passed by proper majority." *Id.* (emphasis added).[12]

■ As to Petitioners' first question, they argue that the circumstances of this vote "present genuine issues of material fact that should have prevented summary judgment in favor of [ ] Respondent." It is axiomatic that

"a circuit court's grant or denial of summary judgment [is reviewed] de novo." *Bremer v. Weeks*, 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004) (quoting *Hawaii Cmty. Fed. Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000)). Therefore, the court's grant of summary judgment in favor of Respondent is reviewed de novo to determine if it was appropriate.

D.

■ Initially, it should be noted that because of Gordon's potential involvement with Nohea Kai, LLC, Petitioners argued that Gordon had a conflict of interest and should not have voted on the pricing policy at the January 30, 2004 meeting. However, Petitioners have presented no evidence that when Gordon voted in favor of the pricing policy, which set the prices at which the Association would sell the leased fee interests, "[a] real or seeming incompatibility [existed] between [Gordon's] private interests and [his] ... fiduciary duties." *Black's Law Dictionary* at 319. At that time, Nohea Kai, LLC was no longer involved in the purchase of the leased fee interests. Petitioners do not establish that Gordon at that point had a "direct personal or pecuniary interest not common to other members of the [A]ssociation." HRS § 514B–125(f). Therefore, based on the evidence in the record, Gordon did not have a conflict of interest when he voted in favor of the pricing policy at the January 30, 2004 meeting.

E.

■ As noted before, with regard to the pricing policy vote, HRS § 514A–82(a)(16) states that "the bylaws shall provide for at

11. Although this section of the HRS quoted by Petitioners and the ICA did not exist at the time of the Board's vote, it does not affect Petitioners' argument. The phrase "conflict of interest" is defined as "[a] real or seeming incompatibility between one's private interests and one's ... fiduciary duties." *Black's Law Dictionary* 319 (8th ed.2004). This court has determined that the definition established by the Legislature in HRS § 514B–125(f) is "consistent with the general definition found in *Black's Law Dictionary.*" *Taniguchi v. Ass'n of Apt. Owners of King Manor,*

*Inc.*, 114 Hawai'i 37, 51 n. 18, 155 P.3d 1138, 1152 n. 18 (2007).

12. The ICA held as to the second question that "[n]either the Association's By–Laws nor HRS [c]hapter 514C prevent making a profit on the purchase of the fee interests." *Alvarez*, 2008 WL 4958487, at *1. As to the third question regarding attorney's fees and costs, the ICA held that the court "did not abuse its discretion in awarding attorney's fees and costs to the Association." *Id.* at *2.

least the following: ... [a]ll association and board of directors meetings shall be conducted in accordance with the most current edition of *Robert's Rules of Order.*" In compliance with subsection (a)(16), Article III, Section 9 of the By–Laws provides that "[a]ll meetings of the Association and the Board of Directors shall be conducted in accordance with the most current edition of *Robert's Rules of Order, Newly Revised.*" To reiterate, the ICA determined that the votes of the two directors who abstained "were correctly not counted in tallying the vote of three in favor and two against the [p]ricing [p]olicy." *Alvarez,* 2008 WL 4958487, at *1.

The ICA looked to *Robert's Rules of Order* § 44 at 387, entitled "Majority Vote-the Basic Requirement," ("the Majority Vote Section") in its determination that "blanks or abstentions" are excluded "when calculating a majority." The relevant portion of that section states that abstentions are not counted in the vote of a simple majority:

> [T]he basic requirement for approval of an action or choice by a deliberative assembly, except where a rule provides otherwise, is a *majority vote.* The word *majority* means "more than half"; and *when the term majority vote is used without qualification—as in the case of the basic requirement—it means more than half of the votes cast by persons legally entitled to vote, excluding blanks or abstentions,* at a regular or properly called meeting at which a quorum [ ] is present.

*Id.* (italics in original) (emphasis added). In other words, when an assembly has adopted this "majority vote" requirement, blank ballots or abstentions are not counted in determining whether a majority has approved the measure.

However, as Petitioners point out, Article IV, Section 9 of the By–Laws does not use the term "majority vote" [13] unqualifiedly. Instead, the term "action by a majority" (*i.e.,* "majority vote") is modified by the phrase "of the directors present." This qualification is significant, as evidenced by the section in *Robert's Rules of Order* entitled "Modifications of Usual Bases for Decision" ("the Modification Section"). *Robert's Rules of Order* § 44 at 389. The relevant portion of that section states that the "majority vote" requirement of a simple majority can be modified by requiring that action be taken by a *majority of the members present:*

> By modifying the concepts of a majority vote and a two-thirds vote, *other bases for determining a voting result can be defined and are sometimes prescribed by rule.* Two elements enter into the definition of such bases for decision: (1) the proportion that must concur—as a majority, two thirds, three fourths, etc.; and (2) *the set of members to which the proportion applies*—which (a) *when not stated, is always the number of members present and voting* (assuming there are no illegal voters), *but* (b) *can be specified by rule as the number of members present,* the total membership, or some other grouping.

*Id.* (italics in original) (emphases added). In other words, the "majority vote" requirement can be altered to require a majority of the "number of members present" ("members present" requirement) such as the one set forth in Article IV, Section 9 of the By–Laws. A quorum was present, and therefore, pursuant to the "members present" requirement in Article IV, Section 9 of the By–Laws, "action by the Board" required "action [*i.e.,* a vote] by a majority of the directors *present* at [the] meeting." (Emphasis added.) As the Modification Section in *Robert's Rules of Order* states, this requirement is different from the "majority vote" requirement which requires a "majority ... of members present *and voting.*" (Emphasis added.)

The Modification Section goes on to state that abstentions, when a majority is calculated based *on the number of voters present,* "*have the same effect as a negative vote*":

> Voting requirements based on the number of members present—a majority of those present, two thirds of those present, etc.— while possible, are generally undesirable. *Since an abstention in such cases has the*

---

**13.** Although Article IV, Section 9 uses the term "action by a majority," rather than the term "majority vote," as used in *Robert's,* both parties assume that the "vote" is an "action" as used in Article IV, Section 9.

*same effect as a negative vote, these bases deny members the right to maintain a neutral position by abstaining. For the same reason, members present who fail to vote through indifference rather than through deliberate neutrality may affect the result negatively.* When such a vote is required, however, the chair must count those present immediately after the affirmative vote is taken, before any change can take place in attendance[ ]."

*Robert's Rules of Order* § 44 at 390 (emphasis added).

Petitioners argue that under this "members present" requirement, because seven members of the Board were present, "four votes in favor of the pricing policy were necessary to constitute a majority of the seven Board members present, the two abstaining members' votes counted as 'no' votes, and when properly tallied there were four votes against the pricing policy and only three votes in favor of it." As a result, according to Petitioners, "the pricing policy did not pass."

14. HRS chapter 514A and the By–Laws treat conflicts of interest in an identical manner. HRS § 514A–82(a)(13) (Supp.2004) states that "[a] director shall not cast a proxy vote at any board meeting, *nor shall a director vote at any board meeting on any issue in which the director has a conflict of interest*[.]" (Emphasis added.) Additionally, HRS § 514A–82(b)(5) (Supp.2004) states that "[a] director who has a conflict of interest on any issue before the board shall disclose the nature of the conflict of interest prior to a vote on that issue at the board meeting, and the minutes of the meeting shall record the fact that a disclosure was made."

HRS chapter 514A does not provide guidance on how to treat the presence of an interested director in a "members present" voting requirement. As to board meetings, HRS § 514A–83.1(a) (1993) states that

[a]ll meetings of the board of directors, other than executive sessions, shall be open to all members of the association, and association members who are not on the board of directors may participate in any deliberation or discussion, other than executive sessions, unless a majority of a quorum of the board of directors votes otherwise.

This provision, however, relates only to whether meetings of the board of directors are open to members of the association, and does not address voting requirements in regard to board actions such as the one at issue in this case.

Respondent argues that such an interpretation creates a conflict between Article IV, Section 11 of the By–Laws, and *Robert's Rules of Order.* As stated before, Article IV, Section 11 of the By–Laws, entitled "Conflicts of Interest," states that *"[n]o director shall vote* or cast a proxy vote at any Board meeting on any matter in which he or she has a conflict of interest. A majority of the directors ... shall determine the existence or nonexistence of such a conflict." [14] (Emphasis added).

Respondent asserts that because the two members who abstained did so due to conflicts of interest, they must be excluded from calculating a majority pursuant to Article IV, Section 11 of the By–Laws. According to Respondent, "[i]f an abstention [15] is counted as a 'no' vote, a conflicted board member would effectively be voting 'no' on the motion[,]" which "would mean that the Board member would effectively caste [sic] a vote in direct conflict of the Governing Documents." Therefore, Respondent argued, "excluding the abstaining members, the remaining five voting directors approved the formulation and the adoption of the pricing policy in

15. *Robert's Rules of Order* does not appear to define the terms "abstain" or "abstention." Based on the context in which *Robert's Rules of Order* uses those terms, however, it appears that to abstain means "to not vote." For example, in a section discussing the vote of a board's presiding officer, or chair, *Robert's* states that "the chair protects his impartial position by exercising his voting right only when his vote would affect the outcome, in which case he can either vote and thereby change the result, or he can abstain. If he abstains, he simply announces the result with no mention of his own vote." *Robert's Rules of Order* § 4 at 50–51. Similarly, *Robert's* states that "[a]lthough it is the duty of every member who has an opinion on a question to express it by his vote, he can abstain, since he cannot be compelled to vote." *Id.* § 45 at 394. Likewise, in discussing the procedure to be followed in a "roll-call vote," *Robert's* states that "[e]ach member, as his name is called, responds in the affirmative or negative.... If he does not wish to vote, he answers *present* (or *abstain*)." *Id.* at 407 (italics in original).

*Black's Law Dictionary* defines "abstain" as "[t]o voluntarily refrain from doing something, such as voting in a deliberative assembly[,]" and "abstention" as "[t]he act of withholding or keeping back (something of oneself); esp., the withholding of a vote." *Black's Law Dictionary* at 8.

compliance with the By–Laws and the approval of the owners."

Respondent argued that in this "conflict" between *Robert's Rules of Order* and the By–Laws, the By–Laws control. *Robert's Rules of Order* confirms this:

> When a society or assembly has adopted a particular parliamentary manual—such as this book—as its authority, the rules contained in that manual are binding upon *it in all cases where they are not inconsistent with the bylaws* (or constitution) or any special rules of order of the body, or any provisions of local, state, or national law applying to the particular type of organization.

*Robert's Rules of Order* § 2 at 16 (emphasis added). However, contrary to Respondent's argument, there is no conflict in this instance between the By–Laws and *Robert's Rules of Order*.

To reiterate, Article IV, Section 11 of the By–Laws states that "no director *shall vote*" on a matter in which the director has a conflict of interest. (Emphasis added). A "vote" is the "expression of one's preference or opinion in a meeting or election by ballot, show of hands, or other type of communication." *Black's Law Dictionary* at 1606. To "abstain" is to "voluntarily refrain from doing something, *such as voting* in a deliberative assembly." *Id.* at 8 (emphasis added). Similarly, "abstention" is "[t]he act of withholding or keeping back (something or oneself); esp., the withholding of a vote." *Id.*

While *Robert's Rules of Order* § 44 at 390 states that in the context of a "members present" requirement, an abstention "has the same *effect* as a negative vote" (emphasis added), it does not say that an abstention in such cases *is* a "no" vote, as Respondent argues. Instead, the Modification Section of *Robert's Rules of Order* indicates that in a "members present" requirement, an abstention has the same effect as a negative vote because the *presence* of the person abstaining is taken into account when the vote is tallied. *See id.* § 45 at 407 (stating that if a member "does not wish to vote, he answers *present* (or *abstain*)" (italics in original)). In such cases, the presence of the person abstaining affects the number of votes that are required to obtain a majority, irrespective of the fact that he or she is not voting. However, having "the same effect as a negative vote" does not mean that the director is actually casting a vote in contravention of Article IV, Section 11 of the By–Laws.

In this case, it is undisputed that all seven directors of the Board were present at the pricing policy meeting. During the vote on the pricing policy, two directors abstained, which means they "voluntarily refrained," or withheld, their votes. To do otherwise would have violated Article IV, Section 11 of the By–Laws. As mandated by the By–Laws' "members present" requirement, however, the presence of the two conflicted Board directors should have been included in the calculation of whether a majority of the directors *present* voted in favor of the pricing policy. Respondent's position would require this court to interpret Article IV, Section 9 as a "majority vote" requirement, giving it the effect of a "present *and* voting" provision. To do so would ignore the plain language of the By–Laws, which requires "action by a majority of the directors *present.*"

In sum, as authorized by the Modification Section in *Robert's,* in Article IV, Section 9 of the By–Laws, the Association adopted a "members present" requirement for the Board to act. In this "members present" requirement, the presence of members at a meeting is taken into account when calculating a majority. Because Article IV, Section 9 of the By–Laws requires "[a]ll meetings of the Association and the Board of Directors shall be conducted in accordance with the most current edition of *Robert's Rules of Order, Newly Revised,*" a majority of the seven directors *present* at the January 30, 2004 meeting, or four directors, was required to vote in favor of the pricing policy in order for it to pass. Inasmuch as only three directors voted in favor of the pricing policy, the policy did not validly pass.

### F.

#### 1.

This conclusion is consistent with this court's decision in *Hawaii Electric Light Co. v. Dep't of Land & Natural Res.,* 102 Hawai'i

257, 263, 75 P.3d 160, 166 (2003), cited by Petitioners in support of their argument. In *Hawaii Electric*, this court examined whether a vote by the Board of Land and Natural Resources (BLNR) constituted a BLNR action within the meaning of its governing statute, HRS 171–5 (1993). *Id.* at 262, 75 P.3d at 165. That statute stated that "any action taken by the [BLNR] shall be by simple majority of the members of the [BLNR]. Four members of the [BLNR] shall constitute a quorum to do business." *Id.*

As required by statute, the BLNR consisted of six members, all of whom attended the meeting at which the vote on whether to deny a power company's application to expand a power generating station took place. *Id.* at 263, 75 P.3d at 166. One of the BLNR members "recused" himself due to a conflict of interest because he owned stock in the parent company of the power company. *Id.* Of the five members who voted, "[t]he [BLNR] voted three to two in favor of ... denying the application." *Id.* The intervenors argued that "so long as a quorum [was] present, a majority of the *members voting* may render a binding decision of the [BLNR]." *Id.* at 267, 75 P.3d at 170 (emphasis added). Additionally, they argued that "the recusal of one of the [BLNR] members [could] be likened to a *temporary resignation, thus reducing the total number of [BLNR] members.*" *Id.* at 268, 75 P.3d at 171 (emphasis added).

As to the BLNR member who did not vote, this court stated that it had previously, in *Lymer v. Kumalae,* 29 Haw. 392 (Terr.1926), "extensively reviewed case law regarding majority voting and abstentions, and held that a majority of the board is a majority of the members of the board 'as constituted by law[,]' irrespective of the number of members present at the time of the vote." *Hawaii Electric,* 102 Hawai'i at 268, 75 P.3d at 171 (brackets in original) (internal citation omitted). It was noted that "[s]imilarly, a number of courts have held that an abstention, disqualification, or sickness does not reduce the total number of members on a board in terms of voting requirements." *Id.* at 269, 75 P.3d at 172. Thus, this court "reaffirm[ed] *Lymer,* and h[e]ld that, unless otherwise prescribed, *the total number of members on a board is not reduced by an abstention, resignation, or vacancy.*" *Id.* (emphasis added.) Ultimately, this court determined that because the BLNR's vote was less than a majority, it did "not amount to [BLNR] action." *Id.* at 270, 75 P.3d at 173.

Respondent argued that Petitioners' reliance on *Hawaii Electric* is "misplaced," because in that case "this court evaluated the voting procedure for a legislatively created *political body* which is held accountable to the *general public*—not to a private homeowners association of owner-members." (Emphases in original.) According to Respondent, *Hawaii Electric* "applied a rule of *strict* statutory construction, not the liberal standard, intended to further the goals of self-governance by a legislatively created body that would weigh issues affecting the general public." (Emphasis in original.) Additionally, Respondent claimed that "the statute at issue also did not include a conflict of interest provision prohibiting interested members from voting." In its Response, Respondent further argues that the issue in *Hawaii Electric* "was not whether an abstention constituted a 'no' vote." Respondent states that *Hawaii Electric* "did not modify, limit, or abrogate the common law rule as to the voting requirements for public administrative or legislative bodies, other than the BLNR, or to other public or private organizations, entities, and associations."

Respondent's attempt to distinguish *Hawaii Electric* on the basis that the statute at issue in that case "did not include a conflict of interest provision prohibiting interested members from voting" is unavailing. While HRS § 171–5 does not contain a conflict provision, this court in *Hawaii Electric* "observe[d] that HRS § 84–14(a)(1) (1993) states that 'no employee shall take any official action directly affecting a business or other undertaking in which he [or she] has a substantial financial interest.'" 102 Hawai'i at 265 n. 17, 75 P.3d at 168 n. 17. Indeed, as discussed *supra*, one of the BLNR members in *Hawaii Electric* recused himself from voting, and this court specifically addressed the issue of whether his recusal affected the requisite majority required for the BLNR to act.

Despite Respondent's attempt to distinguish *Hawaii Electric* as involving a "political body," the statute at issue there, similar to Article IV, Section 9 of the By–Laws in this case, modified the "majority vote" requirement that action by a majority of the members *present and voting* constitutes action by the assembly in question. It was decided that because the statute required a "simple majority of the members of the board," the "majority vote" requirement was inapplicable. *Id.* at 267, 75 P.3d at 170. Likewise, if the Association had intended that action could be taken by a majority of the directors *present and voting,* rather than by a majority of the directors *present,* it could have expressly stated as much. *See id.* at 268, 75 P.3d at 171 ("If the legislature had intended that action could be taken by a majority of the members present and voting rather than by a 'simple majority of the *members of the board* ' then the statute could have expressly provided for that alternative." (Emphasis in original.)).

### 2.

In support of its argument that "conflicted Board members are not counted as present for purposes of voting," Respondent cites to several cases, all of which involve "political bod[ies]," including *Ballenger v. Door County,* 131 Wis.2d 422, 388 N.W.2d 624 (Wis.Ct. App.1986).[16] In *Ballenger,* a county zoning board voted on an ordinance amendment pursuant to a voting requirement in the Wisconsin Statutes which stated that "[a]ll ques-

tions shall be determined by a majority of the supervisors who are present unless otherwise provided." [17] *Id.* at 629. At the meeting at which the vote took place, twenty members attended, with ten voting in favor of the ordinance amendment, nine voting against, and one abstaining due to a conflict of interest. *Id.*

In *Ballenger,* the Wisconsin Court of Appeals held that "when a board member is required by law to abstain from voting, this member is not present for calculating the number of votes required for the passage of legislation." *Id.* In reaching this conclusion, the *Ballenger* court looked to *Robert's Rules of Order* because, "[a]lthough not mandatory authority regarding the interpretation of a Wisconsin statute, ... Rule 33 of the Door County Rules of Order (DCRO) states that *Robert's Rules of Order* is to apply to situations not covered by the DCRO or the Wisconsin statutes." *Id.* at 629 n. 6. That court then quoted from the 1981 edition of "*Robert's Rules of Order,* at § 43," noting that it provided in relevant part that a "[m]ajority vote ... means more than half of the votes cast by persons legally entitled to vote, excluding blanks or abstentions, at a regular or properly called meeting at which a quorum ... is present." [18] *Id.* at 629 n. 7 (ellipses in original).

As noted *supra,* this section of *Robert's Rules of Order* was the authority relied on by the ICA in this case for its conclusion that " 'blanks or abstentions' [are excluded] when calculating a majority." *Alvarez,* 2008 WL

---

**16.** Respondent also cites to *Garner v. Mountainside Board of Adjustment,* 212 N.J.Super. 417, 515 A.2d 280 (Law Div.1986). In *Garner,* which involved a "members present" requirement, the New Jersey Superior Court held that members who were present at a meeting, but were disqualified from voting because they did not attend an earlier meeting, were not "present" for purposes of calculating a majority. *Id.* at 285. *Garner,* however, did not discuss *Robert's Rules of Order* or indicate whether it applied to the decision in that case. Thus, like *Ballenger,* it offers no guidance on the issue in this case. In addition, Respondent relies on *Meixell v. Hellertown Borough Council,* 370 Pa. 420, 88 A.2d 594 (1952) (voting requirement was "a majority of the entire membership of council"), *Alamo Heights v. Gerety,* 264 S.W.2d 778 (Tex.Civ.App.1954) (voting requirement was three-fourths of the members), and *DiCarlo v. Clermont County Board,* No.

CA2003–09–077, 2003 Ohio App. LEXIS 5103 (2003) (no voting requirement indicated), in support of its argument. The voting requirements in these cases, however, did not involve a "members present" requirement, nor did they discuss whether *Robert's Rules of Order* applied.

**17.** The "unless otherwise provided" language was not implicated in this decision.

**18.** Section 43 of the most recent edition of *Robert's Rules of Order,* published in 2000, deals with "Rules Governing Debate." The language in *Ballenger* quoting section 43 of the 1981 edition is identical to that in section 44 of the 2000 edition. Thus, it appears that the *Ballenger* court was citing to the "majority vote" requirement, which, at the time of the 1981 edition, was located in section 43.

4958487, at *1. Like the ICA, however, the *Ballenger* court did not address the section in *Robert's* dealing with modified voting requirements.[19] Unlike *Ballenger*, *Robert's Rules of Order* is binding authority on the meetings of the Board. HRS § 514A–82(a)(16). As already discussed, *Robert's Rules of Order* differentiates between the counting of abstentions in a "majority vote" requirement and the counting of abstentions in a "members present" requirement. Because *Ballenger* did not address the Modification Section in *Robert's Rules of Order*, it is not persuasive here.

On the other hand, other courts have held that where the "majority vote" requirement has been modified by some form of the "members present" requirement, present members who do not vote affect the calculation of a majority. *See, e.g., Mann v. Hous. Auth. of City of Paterson*, 20 N.J.Super. 276, 89 A.2d 725, 726 (Law Div.1952); *Livesey v. Borough of Secaucus*, 97 A. 950, 951 (N.J. 1916). In *Mann*, the statutory voting requirement stated that "[a]ction may be taken by the authority upon the affirmative vote of the majority but not less than three, of the commissioners present, unless in any case the by-laws of the authority shall require a larger number." 89 A.2d at 726 (quotation marks omitted). Six commissioners attended a meeting to vote on a resolution and the result of the vote was "3 in the affirmative [and] 3 abstained [20] from voting." *Id.* at 727 (quotation marks omitted). The *Mann* court held that an abstention "is not an expression of the choice or preference of the voter. As six commissioners were present at the meeting, passage of the resolutions clearly required four affirmative votes. But three were recorded, so the resolutions failed of legal passage and are, therefore, wholly invalid." *Id.* at 729, 89 A.2d 725.

In *Livesey*, the New Jersey Supreme Court did not expressly state the applicable voting requirement, but it appears to have been a "members present" requirement. *See* 97 A. at 951. The facts provided by the

court in *Livesey* "[w]ith respect to the majority vote ... were that the borough council consisted of six members all of whom were present; that three voted for confirmation, two were opposed to confirmation, and one was excused from voting because of interest." *Id.* The New Jersey Supreme Court held that the confirmation did not validly pass because "a majority vote of those present means what it says, notwithstanding some do not participate in the vote." *Id.* The decisions in *Mann* and *Livesey* are consistent with this court's decision in *Hawaii Electric*, cited by Petitioners in support of their argument.

In light of the foregoing analysis, summary judgment should have been entered in favor of Petitioners on the pricing policy vote.

## PART II: ESTOPPEL

(By: Moon, C.J., with whom Nakayama, J. and Substitute Justice Nishimura, join)

■ Notwithstanding the foregoing discussion and holding in Part I, *supra*, we are obligated to affirm the judgment of the circuit court because, as discussed more fully *infra*, Petitioners failed to challenge a basis for the circuit court's denial of Petitioners' partial summary judgment motion, *i.e.*, that Petitioners were estopped from challenging the adoption of the pricing policy. As quoted above, the circuit court, in its order denying Petitioners' partial summary judgment motion, concluded, *inter alia*, that:

2. The pricing policy for the sale of the leased fee interests does not violate Chapter 514C, the amended Declaration or the By–Laws; [and]

. . .;

5. [Petitioners] voted in favor of the amendment to the [d]eclaration, and[,] thus, *[were] estopped from challenging the Association's exercise of the right of first refusal **and the adoption of its current pricing policy** as authorized by the*

---

19. Indeed, because the Wisconsin Court of Appeals was relying on the 1981 edition of *Robert's Rules of Order*, it is not certain that the 1981 edition contained the provision related to the "members present" requirement for voting.

20. No reason was given in *Mann* for the abstentions.

*amended [d]eclaration and as **approved by the Board [of Directors]**.*

(Emphases added.) In their briefs before the ICA and this court, Petitioners' arguments focused solely on the circuit court's rulings regarding (1) whether the pricing policy was validly approved, (2) whether Respondents were prevented from making a profit on the leased fee interests, and (3) attorney's fees; nowhere in their briefs did Petitioners challenge or present any argument regarding the circuit court's conclusion that they were estopped from challenging the Association's adoption of its current pricing policy, which was a basis for the circuit court's ruling on the pricing policy issue. Indeed, Petitioners conceded during oral argument that they did not directly challenge the circuit court's conclusion regarding estoppel, but maintained that they did not do so because it was unclear which of the Board's actions Petitioners were estopped from challenging. In other words, the circuit court's conclusion was ambiguous. We disagree.

The circuit court's conclusion, as quoted above, clearly stated that Petitioners were "estopped from challenging [ (1) ] the Association's exercise of the right of first refusal and [ (2) ] *the adoption of its current pricing policy*." *Id.* (emphases added). Nevertheless, even assuming Petitioners are correct, an assertion of ambiguity in the circuit court's conclusion regarding estoppel requires a specific challenge to the alleged ambiguous conclusion by Petitioners. *See* Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4) (2008).

■ HRAP Rule 28(b)(4)(C) states that an appellant must specifically set forth a concise statement of the points of error, including, *inter alia,* "the alleged error committed by the court"—in this case, the allegedly ambiguous conclusion—and provide "either a quotation of the finding or conclusion urged as error or reference to appended findings and conclusions[.]" *"Points not presented in accordance with [HRAP Rule 28(b)(4) ] will be disregarded."* HRAP Rule 28(b)(4) (emphasis added). In the instant case, Petitioners did *not* specifically identify or challenge the circuit court's conclusion regarding estoppel in their briefs on direct appeal or in their application, as they conceded at oral argument. It is well-established in this jurisdiction that, where a party does not raise specific issues on appeal to the ICA or on application to this court, the issues are deemed waived and need not be considered. *E & J Lounge Operating Co., Inc. v. Liquor Comm'n of the City & County of Honolulu,* 118 Hawai'i 320, 347, 189 P.3d 432, 459 (2008); *see also Ass'n of Apartment Owners of Newtown Meadows ex. rel. its Bd. of Dirs. v. Venture 15, Inc.,* 115 Hawai'i 232, 257, 167 P.3d 225, 250 (2007) (concluding that the appellant's contentions on application were "deemed waived" because they did not "assign as error" or "present any argument" regarding the circuit court's ruling). Inasmuch as the circuit court's estoppel ruling was not identified as error nor specifically argued by Petitioners, it cannot be considered by this court (unless noticed under the plain error doctrine, discussed more fully *infra* ).[21]

**21.** The dissent argues that, "although the estoppel issue was not expressly listed as an error," dissenting op. at 496, 221 P.3d at 474, such issue was—"as a matter of judicial fact," *id.* at 497, 221 P.3d at 475, and "[b]y necessary implication," *id.* at 496, 221 P.3d at 474—joined on appeal "inasmuch as the voting issue was fully briefed by the parties and decided by the ICA." *Id.* at 496, 221 P.3d at 474 (footnote omitted). In support of its position, the dissent references, *inter alia,* the facts that (1) "Respondent and the ICA did not contend Petitioners were precluded from appealing the invalidity of the vote"; (2) "Respondent did *not* assert that Petitioners were prevented from arguing the vote itself was erroneous"; and (3) the ICA "decided the legality of the vote without objecting that Petitioners had failed to raise the estoppel order." *Id.* at 497,

221 P.3d at 475 (emphasis in original) (footnotes omitted).

Contrary to the dissent's view, fully briefing an issue on the merits that was subsequently decided by the ICA *did not* relieve the Petitioners of their burden to challenge the conclusion of law regarding estoppel. To the contrary, inasmuch as the Petitioners failed to "expressly raise" and/or argue the issue of estoppel, which the dissent acknowledges, they *failed to meet their burden.* Consequently, the issue of estoppel was not raised "as a matter of judicial fact" or "by necessary implication." Additionally, it was not the Respondent's burden to assert that Petitioners were estopped from challenging the validity of the vote—as the dissent erroneously suggests— and the ICA did not have an obligation to "ob-

It is also well-settled that all unchallenged conclusions by the circuit court are considered binding upon this court. *Wong v. Cayetano*, 111 Hawai'i 462, 479, 143 P.3d 1, 18 (2006) (citation omitted). Consequently, the circuit court's unchallenged conclusion that Petitioners were estopped from challenging the adoption of the pricing policy is binding on this court. Inasmuch as the circuit court's estoppel conclusion constituted a separate basis for its denial of Petitioners' partial motion for summary judgment, we are compelled by our rules and case law to affirm such ruling.

The dissent, however, contends that the estoppel ruling "must be addressed in order to reach the central issue on appeal of whether the pricing policy was validly adopted." Dissenting op. at 496, 221 P.3d at 474. The dissent submits that, in this case, "the only conclusion rendered by the court in regard to the vote was that Petitioners were estopped from challenging it, and[,] thus, by challenging the validity of the vote, Petitioners challenged this conclusion." *Id.* at 497, 221 P.3d at 475. More specifically, the dissent contends that "[t]he court's first four conclusions clearly addressed whether the pricing policy itself, by allowing the Association to make a *profit* on the sales of leased fee interests, violated statutory law, the Amended Declaration, or the By–Laws," *id.* (emphasis in original) and only one conclusion addressed the pricing policy vote. *Id.* at 497, 221 P.3d at 475.

The dissent's reasoning is unavailing because, as previously indicated, the circuit court's denial of Petitioners' motion for partial summary judgment was based on *two independent legal conclusions* regarding the pricing policy vote. Specifically, the circuit court concluded that: (1) "the pricing policy for the sale of the leased fee interests [did] not violate Chapter 514C, the amended Declaration[,] or the By–Laws"; and (2) the Petitioners were estopped from challenging the adoption of the pricing policy. With respect to the court's conclusion that the pricing policy did not violate the By–Laws, such By–

Laws included specific voting requirements which provided, *inter alia*, that no action may be taken by the Association's Board without a vote of a majority of the members present. In our view, absent evidence to the contrary, the court's general conclusion that the pricing policy did not violate the By–Laws included the determination that the policy did not violate the voting requirements set forth in the By–Laws. In other words, for the court to even reach the question whether the substantive provisions of the pricing policy itself were violative, the policy had to be validly adopted in the first instance via the voting requirements set forth in the By–Laws. As a result, such conclusion addressed the validity of the pricing policy vote, not merely "whether the pricing policy itself, by allowing the Association to make a *profit* on the sales of leased fee interests, violated statutory law, the Amended Declaration, or the By–Laws," as the dissent contends. Dissenting op. at 497, 221 P.3d at 475 (emphasis in original). Accordingly, the estoppel conclusion, in our view, constitutes a separate and independent ground for the circuit court's ruling which cannot be addressed by this court because the Petitioners failed to specifically challenge it.

The dissent additionally claims that

the ICA['s] rul[ing] that the abstentions at the January 24, 2004 meeting should not be counted and that, as a result, the pricing policy was passed by a majority of the directors ... confirms that the ICA concluded that Petitioners were *not* estopped from challenging the validity of the vote, *because had it concluded otherwise, there would have been no need for it to address the validity of the vote*.

*Id.* at 498–99, 221 P.3d at 476–77 (emphases in original). We cannot agree.

First, as the dissent recognizes, the ICA agreed with the court regarding the validity of the vote itself and affirmed the court's denial of Petitioner's motion for summary judgment on that ground. Therefore, there

---

ject" to or point out, much less address, Petitioners' failure to raise the issue of estoppel, especially in light of the fact that it affirmed the circuit court's separate and distinct conclusion that the

vote was valid which rendered it unnecessary to address the circuit court's conclusion regarding estoppel.

was no need for the ICA to address the court's separate conclusion regarding estoppel. Consequently, the ICA's "failure" to discuss the estoppel conclusion, contrary to the dissent's argument, signals its apparent view that the such conclusion was separate and distinct from the conclusion regarding the validity of the vote.

Additionally, if the ICA had determined that Petitioners were not estopped from challenging the vote, such determination would have rendered the circuit court's estoppel conclusion erroneous. It cannot be assumed, based on the ICA's omission of estoppel, that the ICA: (1) determined that the court's estoppel conclusion was erroneous; (2) decided it was unnecessary to articulate such error; and, then, (3) based its discussion of the validity of the vote on its "silent" determination that the estoppel conclusion was erroneous. Such an assumption is contrary to the well-settled role of the appellate courts to articulate the errors upon which its discussion and holdings are based. Consequently, we cannot agree with the dissent that "the ICA['s] rul[ing] . . . confirms that [it] concluded that Petitioners were *not* estopped from challenging the validity of the vote." *Id.* (emphasis in original).

■ At oral argument, Petitioners contended that, notwithstanding their failure to challenge the circuit court's ruling on the issue of estoppel, this court should *sua sponte* address the issue based on the plain error doctrine.[22] *See* HRAP Rule 28(b)(4) ("Points not presented in accordance with this section will be disregarded, except that the appellate court, at its option, may notice a plain error not presented.") This court has previously stated that,

> [i]n civil cases, the plain error rule is only invoked when "justice so requires." We have taken three factors into account in deciding whether our discretionary power to notice plain error ought to be exercised in civil cases: (1) whether consideration of the issue not raised at trial requires additional facts; (2) whether its resolution will affect the integrity of the trial court's find-

ings of fact; and (3) whether the issue is of great public import.

*Montalvo v. Lapez,* 77 Hawai'i 282, 290, 884 P.2d 345, 353 (1994) (citing *State v. Fox,* 70 Haw. 46, 56 n. 2, 760 P.2d 670, 676 n. 2 (1988)) (other citations omitted).

With regard to the first factor, *i.e.,* the need for additional facts, such factor is based on the tenet that "an appellate court should not review an issue based upon an undeveloped factual record." *Montalvo,* 77 Hawai'i at 290–91, 884 P.2d at 353–54 (citation omitted). Here, the circuit court rendered its judgment on a motion for summary judgment. As a result, consideration of the estoppel issue does not "require additional facts." *See Fujioka v. Kam,* 55 Haw. 7, 514 P.2d 568 (1973); *see also Earl M. Jorgensen Co. v. Mark Const., Inc.,* 56 Haw. 466, 540 P.2d 978 (1975). Thus, the first factor of the plain error test is met.

■ Second, we believe that the second factor of the plain error test weighs *against* plain error review if the resolution of an issue would *not* affect the integrity of the findings of fact and that several cases from this jurisdiction support our interpretation of the second factor. For example, in *Montalvo,* this court reached the opposite conclusion as that set forth in *In re Hawaiian Land Co.,* 53 Haw. 45, 487 P.2d 1070 (1971), and *Jorgensen,* concluding that "[t]he error here meets each of the three [plain error] factors" and explaining that, as to the second prong of the test, "[t]he error here . . . *affects the integrity of the jury's findings.*" 77 Hawai'i at 290–91, 884 P.2d at 353–54 (emphasis added). Similarly, this court, in *Shanghai Inv. Co., Inc. v. Alteka Co., Ltd.,* 92 Hawai'i 482, 993 P.2d 516 (2000), cited *Montalvo* and declined to notice plain error where "[t]he error . . . did not substantially affect the integrity of the jury's findings." *Id.* at 499–500, 993 P.2d at 533–34, *overruled on other grounds by Blair v. Ing,* 96 Hawai'i 327, 331 n. 6, 31 P.3d 184, 188 n. 6 (2001). Further, this court held, in *Office of Hawaiian Affairs v. State,* 96 Hawai'i 388, 31 P.3d 901 (2001), that,

---

**22.** However, Petitioners did not present any argument regarding plain error in their application.

"[b]ecause the effect of the Forgiveness Act is purely a question of law, *the outcome of which **will affect** the integrity of the circuit court's findings of fact* ... we will exercise our discretion in addressing the matter." *Id.* at 396 n. 12, 31 P.3d at 909 n. 12 (emphases added); *see also Hill v. Inouye,* 90 Hawai'i 76, 82, 976 P.2d 390, 396 (1998) (recognizing plain error where, *inter alia,* the resolution of the issue "directly affects the family court's outcome in this case").

The dissent, however, takes a contrary position, arguing that, if the resolution of an issue would not affect the integrity of the findings of fact, then such factor weighs *in favor* of plain error review. Dissenting op. at 503–504, 221 P.3d at 481–82. The dissent claims that its interpretation is "supported by the history of the [plain error] test, which reveals that the second factor was intended to caution the appellate court against disturbing the integrity of the fact findings process." *Id.* at 502, 221 P.3d at 480. In further support of its position, the dissent relies on *Hawaiian Land Co.* and *Jorgensen.* Dissenting op. at 503–505, 221 P.3d at 481–83. As explained by the dissent, the *Hawaiian Land* court held that, because an "issue [did] *not* attack the integrity of the fact finding process," the court would consider such issue based on plain error. *Hawaiian Land,* 53 Haw. at 53, 487 P.2d at 1076. Similarly, this court, in *Jorgensen,* concluded that the second factor weighed *in favor of addressing a newly raised issue based on plain error* because "[t]he consideration of this issue raised for the first time on appeal will not affect the integrity of any findings of fact of the trial court." *Jorgensen,* 56 Haw. at 476, 540 P.2d at 985. The dissent also cites more recent cases that apply the second factor in accordance with its interpretation, specifically: (1) *Hong v. Kong,* 5 Haw.App. 174, 177, 683 P.2d 833, 837 (1984), which relied on *Jorgensen* and *Fujioka* and declined to notice plain error because, *inter alia,* "consideration of the new issues [would] affect the integrity of the findings of fact"; and (2) *Cabral v. McBryde Sugar Co., Ltd.,* 3 Haw.App. 223, 647 P.2d 1232 (1982), in which the court reasoned that plain error review was appropriate because, *inter alia,* the resolution of the issue would *not* affect the integrity of the

findings of fact. *Id.* at 226–27, 647 P.2d at 1234; dissenting op. at 507–508, 221 P.3d at 485–86.

In light of such case law, it is evident that this court has inconsistently applied the second plain error factor. However, we believe it appropriate to leave the definitive interpretation to another day because, as discussed more fully below, the second factor *does not apply in the context of this case.*

■ It is well-settled that the circuit court does not try factual issues on a motion for summary judgment. *Fujioka,* 55 Haw. at 9, 514 P.2d at 570. Inasmuch as the case at bar is an appeal from a denial of a motion for partial summary judgment, the court did not try factual issues and, as a result, there are no material facts in issue. Consequently, there are no "findings of fact" whose "integrity" could be "affected" by the instant appeal and, thus, the second factor does not apply in the instant case. *See Honda v. Board of Trustees of the Employees' Retirement System,* 108 Hawai'i 212, 242 n. 14, 118 P.3d 1155, 1185 n. 14 (2005) (Levinson, J., dissenting with whom Moon, C.J., joined) (stating that, "inasmuch as [*Jorgensen*] and *Fujioka* involve appeals from orders granting summary judgment, there were no [findings of fact] in those cases and the second prong of the [plain error] test did not apply"). In sum, we conclude that, because the instant appeal is from an order denying a motion for partial summary judgment, there are no material facts in issue that could be "affected" and, as such, the second plain error factor *does not apply.* We turn now to examine the third plain error factor.

■ Finally, with regard to the third factor, *i.e.,* whether the issue of estoppel is one of "great public import," this court has determined that, in civil cases, an issue is of "great public import" for the purposes of plain error review only when such issue affects the public interest. For example, in *Montalvo,* we reviewed the issue whether the trial court erred in failing to properly instruct the jury on an essential element of the underlying cause of action based on plain error because it is in the public's interest for this court to "preserv[e] the integrity of our jury system"

and, thus, the issue was one of "great public import." 77 Hawai'i at 291, 884 P.2d at 354. Additionally, this court, in *Fujioka,* implicitly recognized that the constitutionality of a statute was a matter of public interest when it addressed the appellant's argument regarding the unconstitutionality of a statute, even though such argument was raised for the first time on appeal, because the issue was "of great public import." *Fujioka,* 55 Haw. at 9, 514 P.2d at 570. Likewise, this court has invoked the doctrine of plain error to address whether federal law bars the state from using monies derived from the State's airport system to pay the Office of Hawaiian Affairs, stating that such issue was "a matter of great public import." *See Office of Hawaiian Affairs v. State,* 96 Hawai'i 388, 396 n. 12, 31 P.3d 901, 909 n. 12 (2001).

In the instant case, the issue whether Petitioners had the right to contest the validity of the Board's voting procedure does not constitute a matter of "public interest" because (1) such right is of a private nature and (2) the issue applies exclusively to the facts and circumstances of Petitioners' case. More specifically, the court's conclusion of law regarding estoppel was applicable exclusively to Petitioners because it was based upon their individual acquiescence to the amendment to the Declaration. Further, it is Petitioners' own failure to challenge the court's conclusion of law regarding estoppel that constrains us in our decision. Thus, contrary to the dissent's view, *no other AOAO community* will be negatively impacted by our holding inasmuch as the estoppel issue is, as previously indicated, exclusive to the distinct facts and circumstances of the present case. As such, this court's holding will not "undermine[ ] the public policy in HRS chapter 514A" as to a "large number of AOAO communities" (as the dissent contends) or have any effect on the "orderly and fair disposition of controversies in . . . [such] AOAO communities." Dissenting op. at 509, 221 P.3d at 487. The dissent further argues that "[t]he majority's estoppel ruling extends beyond the 'Petitioners' case[ ]' [because] HRS § 514A–82(a)(16) and *Robert's* apply not only in this case, but to all [AOAOs] and their governance." *Id.* at 509, 221 P.3d at 487. Thus, the dissent argues that the issue of

estoppel is a matter of great public import because

> [p]ermitting the invalid pricing policy to remain uncorrected[ ] means for all AOAOs (1) that HRS § 514A–82, "Contents of bylaws," is superseded by the estoppel doctrine, and (2) HRS § 514A–82(a)(16) has little impact on the governance of AOAOs, inasmuch as, under the majority's formulation, AOAOs need only repeat the words of the statute in their by-laws, but *not* actually follow those provisions. . . . Thus, the majority's ruling calls into question the viability of all AOAO bylaws, by sustaining a violation of HRS § 514A–82(a)(16).

*Id.* at 510, 221 P.3d at 488 (emphasis in original). As discussed at length *supra,* we concluded that, upon critically examining the plain language of HRS § 514A–82(a)(16), the pricing policy vote did not violate such statute. Thus, our estoppel holding does not diminish the impact of HRS § 514A–82(a)(16) on the governance of all AOAOs or "supercede[ ]" all provisions in HRS § 514A–82, as the dissent contends. *See id.* at 510, 221 P.3d at 488. Further, although we agree with the dissent that HRS § 514A–82(a)(16) and *Robert's* "apply to AOAOs and their governance," *id.* at 509, 221 P.3d at 487, the critical facts in this case upon which our ultimate ruling is based, *i.e.,* that the Petitioners failed to challenge an otherwise binding conclusion of law, are personal and individual to the Petitioners. Thus, it is evident that, despite the dissent's insistence that our "ruling calls into question the viability of *all* AOAO bylaws," *id.* at 510, 221 P.3d at 488, our estoppel holding is applicable only to the Petitioners—not "all AOAOs and their governance." Consequently, the dissent's argument that the issue of estoppel is a matter of great public import is unavailing.

Moreover, Petitioners did not set forth any arguments in their application with regard to plain error nor did they provide any cogent reasons during oral argument for this court to exercise its discretion in invoking plain error to examine the issue of estoppel on the merits. Consequently, we decline to *sua sponte* invoke plain error under these cir-

cumstances.[23] Inasmuch as we are constrained by our rules and case law from addressing the court's conclusion that Petitioners were estopped from challenging the adoption of the pricing policy on the merits, we are obligated to affirm the judgment of the court.[24]

Relying on the proposition that " '[n]ot even estoppel can legalize or vitalize that which the law declares unlawful and void,' " dissenting op. at 511, 221 P.3d at 489 (citation omitted), the dissent contends that "estoppel cannot be used [in this case] to prevent Petitioners from challenging a vote that was unlawful under a state statute [—here, HRS § 514A–82(a)(16)—] because otherwise 'estoppel does what the public policy and the law has forbidden.' " *Id.* at 513, 221 P.3d at 491 (citing *Tobacco By–Products & Chemical Corp. v. W. Dark Fired Tobacco Growers Ass'n,* 280 Ky. 469, 133 S.W.2d 723, 726 (App.1939)). In attempting to support its position that the pricing policy vote was unlawful under HRS § 514A–82(a)(16), the dissent first declares that the entirety of HRS § 514A–82 "is intended to apply to the '[c]ontents of bylaws' " (with which we agree) and, second, claims that subpart (a)(16) of the statute "dictates that *Robert's* applies" to all association meetings. Dissenting op. at 512, 221 P.3d at 490. The dissent then reasons that, "[i]n accordance with the By–Laws that adopted a 'members present' provision, the vote was invalid under the Modification Section of *Robert's,*" *id.,* which then leads it to conclude that, "therefore, [the vote was] also invalid under HRS § 514A–82." *Id.* Thus, in the dissent's view, "[c]ompliance with HRS § 514A–82(a)(16) is depend[e]nt upon whether the Board obeyed the direction in the By–Laws as applied to *Robert's,* not on whether the association's By–Laws simply restated

the language set forth in the statute[.]" *Id.* at 501, 221 P.3d at 479. Based on its position that the vote violated HRS § 514A–82(a)(16), the dissent argues that "to confirm the invalid vote by the Board would contravene the policy embodied in HRS § 514A–82(a)(16)." *Id.* at 512, 221 P.3d at 490 (citation omitted). However, we are unpersuaded by the dissent's arguments because, as discussed below, the dissent misinterprets the plain language of HRS § 514A–82(a)(16).

■ The plain language of HRS § 514A–82(a)(16) provided that "*[t]he bylaws shall provide for at least the following* ... [that a]ll association and board of directors meetings shall be conducted in accordance with the most current edition of *Robert's Rules of Order.*" (Emphasis added). A strict reading of such plain language reveals that the statute governs only *the content* of the by-laws by requiring that certain provisions be included in an association's by-laws. Thus, the only "policy embodied" in HRS § 514A–82 is that association by-laws must, at minimum, contain all of the provisions enumerated therein. As such, an association has lawfully complied with HRS § 514A–82(a)(16) once it has placed a provision in its bylaws that states that "all association and board meetings shall be conducted in accordance with *Robert's.*" In other words, compliance with HRS § 514A–82(a)(16) is not dependent upon whether the Board "obeyed the direction in the By–Laws as applied pursuant to *Robert's,*" *id.* at 500, 221 P.3d at 478, as the dissent contends, *but only upon whether the contents of the by-laws themselves meet the minimum statutory requirements.* Such proposition is supported by the fact that, as

---

**23.** The dissent argues that this court should *sua sponte* invoke plain error because the circuit court's estoppel ruling "is wrong as a matter of law." Dissenting op. at 510, 221 P.3d at 488. However, the correctness of the circuit court's ruling is the *very issue the Petitioners failed to raise and this court is prevented from addressing.* Thus, even if the circuit court's estoppel ruling was "wrong as a matter of law," we are bound by the standard for invoking plain error *sua sponte.* Having determined that the three factors, as discussed *supra,* do not weigh in favor of invoking plain error, any view as to the correct-

ness or incorrectness of the circuit court's conclusion is irrelevant because, as also discussed *supra,* we are constrained by the unchallenged conclusion.

**24.** In light of our conclusion that we are obligated to affirm the court's final judgment, we need not consider the remaining issues whether (1) the Association was prevented from making a profit on the sale of its leased fee interests and (2) the circuit court abused its discretion in awarding attorneys' fees and costs to Respondent.

acknowledged by the dissent, HRS § 514A–82 is entitled "Contents of Bylaws."

Here, the By–Laws of the Association in the instant case contained the requisite provision and, thus, clearly complied with the statute. Thus, once compliance with the statutory requirement is established (as it has been here), any further reference to HRS § 514A–82—specifically, subsection (a)(16),—for the purpose of determining whether a board complied with its by-laws and conducted its meeting in accordance with *Robert's* is unnecessary. Accordingly, the dissent's argument that the pricing policy vote was "unlawful" because it violated HRS § 514A–82(a)(16) is plainly wrong. In any event and as discussed more fully *infra,* the pricing policy vote at issue in this case *was conducted* "in accordance with ... *Robert's.*"

As demonstrated by the lengthy discussion in Part I of this opinion, *Robert's* contains a number of options with respect to voting. *See* Part I at 482–83, 221 P.3d at 460–61 (discussing the voting options set forth in *Robert's Rules,* including a majority of "members present," a simple majority, and a majority of members present and voting). Of the options available under *Robert's,* the Association's By–Laws in the instant case establish that action can be taken only by a majority of *members present. See* Part I at 482, 221 P.3d at 460. The pricing policy vote, however, was not conducted in accordance with the voting method opted for in the Association's By–Laws. Thus, the vote was invalid because *it violated the By–Laws.* Nevertheless, as previously stated, the pricing policy vote was conducted in accordance with *Robert's.* As the dissent recognizes, the Modification Section of *Robert's* explicitly permits the voting method utilized by the Board, *i.e.,* "approval of an action or choice" by a "majority of directors present and voting," *i.e.,* a basic majority of directors. *See Robert's* § 44(2)(a) at 389.

Here, as previously indicated, the pricing policy was approved by three out of five non-abstaining directors, and the two abstaining directors were not counted in the pricing policy vote. *See* Part I at 483, 221 P.3d at 461. Because the abstentions were not counted, they did not affect the voting and,

as a result, the pricing policy was approved by a majority of the directors present *and* voting, which we emphasize is a voting method permitted under *Robert's.* Thus, the pricing policy vote complied with section 44(2)(a) of the Modification Section of *Robert's,* even though the vote did not comply with the "members present" voting method opted for in the By–Laws. Accordingly, (1) although the pricing policy vote violated the Association's By-laws, the By-laws themselves complied with HRS § 514A–82(a)(16) and, (2) because the voting method utilized by the Board is explicitly permitted in *Robert's,* it cannot be said—as the dissent maintains— that the pricing policy vote was *unlawful under HRS § 514A–82 such that estoppel cannot be applied.*

In support of its position that the application of estoppel will frustrate the policy in HRS § 514A–82(a)(16), the dissent cites the following three cases: (1) *Commissioner of Banks v. Cosmopolitan Trust Co.,* 253 Mass. 205, 148 N.E. 609 (1925); (2) *Appon v. Belle Isle Corp.,* 46 A.2d 749 (Del.1946); and (3) *Tobacco By–Products & Chemical Corp.,* 133 S.W.2d at 726. Dissenting op. at 511–12, 221 P.3d at 489–90. As discussed below, each of these cases is distinguishable from the instant case.

In *Commissioner of Banks,* the board of directors of a corporation violated a distinct "prohibition of statute" when it unlawfully issued an increase in its capital stock; however, the shareholders acquiesced to such increase. *Commissioner of Banks,* 148 N.E. at 613. As indicated by the dissent in the instant case, the Supreme Court of Massachusetts, in considering the issue whether estoppel could prevent the shareholders from challenging the increase in stock, held that "[a]cquiescence cannot clothe with legality a positively illegal act ... [and o]ne cannot ordinarily be estopped to assert the direct violation of a decisive prohibition of statute." *Id.* at 614. Consequently, the court did not apply estoppel to prohibit the shareholders from contesting the illegal increase in stock. *Id.* Similarly, the Supreme Court of Delaware, in *Appon,* held that estoppel did not preclude the complainants' attack of an agreement because such agreement "violated

Section 18 of the General Corporation Law of Delaware." *Appon,* 46 A.2d at 760–61. Ultimately, the court "set aside the agreement." *Id.* at 761. Likewise, the Kentucky Court of Appeals, in *Tobacco By–Products,* held that estoppel should not have been applied by the trial court to deny appellant recovery because the agreement in question violated Section 214 of the Kentucky state constitution. *Tobacco By–Products,* 133 S.W.2d at 726. In its reasoning, the court stated that "a court may not clothe with legality a contract that is absolutely illegal and void even by the application of the doctrine of equitable estoppel." *Id.*

In each of these cases, there was a clear violation of a constitutional or statutory provision such that, if estoppel had been applied to permit such violations, public policy would have been frustrated. In contrast, there was no violation of a statute or constitutional provision of law in the instant case. The dissent claims that such cases are analogous to the instant case because, "like those cases, the application of estoppel in this case" will "allow[ ] the Board to violate HRS § 514A–82(a)(16)" and "frustrate the public policy establishing uniform governing procedures for AOAOs in HRS chapter 514A." Dissenting op. at 513, 221 P.3d at 491. As discussed *supra,* the pricing policy vote did not violate HRS § 514A–82(a)(16) and, based on the facts and circumstances of the case, no other provision of HRS Chapter 514A is implicated. Thus, we fail to see how the "application of estoppel in this case" would "allow[ ] the Board to violate HRS § 514A–82(a)(16)" or "frustrate" the policy embodied in Chapter 514A. *Id.*

Based on the foregoing, the use of estoppel in the present case would not "do what the public policy and the law has forbidden," *id.* at 512, 221 P.3d at 490, and, as such, the dissent's argument lacks merit.

## VIII. *CONCLUSION*

Based on the foregoing, we unanimously conclude that the ICA erred in holding that the Association's Board validly adopted the pricing policy vote and that summary judgment should have been entered in favor of Petitioners as to the pricing policy vote.

However, notwithstanding such conclusion, we (the majority in Part II) are bound by the unchallenged conclusion of law that Petitioners are estopped from challenging the pricing policy vote. Consequently, the majority affirms the judgment of the circuit court.

Dissenting Opinion by ACOBA, J.,
Regarding Estoppel, with whom DUFFY, J., Joins.

I respectfully dissent to affirming the judgment of the court. The court's estoppel ruling should not bar us from enforcing this court's determination that the pricing policy was not validly adopted on any or all of the following four grounds: (1) the validity of the vote was a central and determinative issue on appeal to the Intermediate Court of Appeals (the ICA) and in this court, (2) the validity of the vote was raised and fully briefed in the circuit court of the second circuit (the court) and on appeal, (3) it was plain error for the court to rule that Petitioners/Plaintiffs–Appellants Alvarez Family Trust, Sergio S. Alvarez and Margaret J. Alvarez (Petitioners) are estopped from challenging the validity of the vote under Hawai'i Revised Statutes (HRS) § 514A–82(a)(16) (Supp.2003), and (4) estoppel is an equitable principle, and cannot be used to prevent Petitioners from arguing that the vote was illegal and void.

## I.

First, this court must address the court's estoppel conclusion in order to reach a correct, complete, and fair result in this case. As other courts have wisely stated,

> [w]hen an issue of law that was not argued below is implicit in another issue that was argued and is presented by an appeal, [an appellate court] may consider and resolve that implicit issue. *To put it another way, if [an appellate court] must resolve a legal issue that was not raised below in order to reach a legal issue that was raised, [it] will do so.*

*Gross v. State Med. Bd. of Ohio,* No. 08AP–437, 2008 WL 5381948, at *2 (Ohio App. 10 Dist. Dec.23, 2008) (emphasis added); *see also State v. Kramer,* 668 N.W.2d 32, 35 n. 1 (Minn.App.2003) ("Generally, we do not ad-

dress issues not raised below[, but b]ecause we cannot address [defendant's] challenge to the sufficiency of the evidence without first addressing the burden shouldered by each party, we must, for the purposes of our analysis, reach the merits of this argument."); *Kustura v. Dep't of Labor & Indus.*, 142 Wash.App. 655, 175 P.3d 1117, 1128 n. 35 (Div. 1 2008) ("We note that while it was raised below, the workers did not raise this specific issue on appeal ... [b]ut we will consider it *because it is necessary to reach a proper decision.*" (Emphasis added.)).

Similarly, in *Belvedere Condominium Unit Owners' Ass'n v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 617 N.E.2d 1075 (1993), the condominium association argued that the developer breached its fiduciary duty by "fail[ing] to disclose material facts regarding the lease" between the two parties. *Id.* at 1083. The association argued that the *Belvedere* court should not decide the issue of whether developers owed a fiduciary duty to condominium owners' associations "because it was not expressly briefed or argued in the courts below. The [condominium association] would have [the *Belvedere* court] assume that there is such a duty and go on to decide whether [the developer] breached that duty." *Id.* at 1079. The *Belvedere* court disagreed, holding that in order to reach the issue of breach, it first had to determine if a duty existed, stating that

> [a]s a general rule, this court will not consider arguments that were not raised in the courts below. *The waiver doctrine, however, is not absolute.* When an issue of law that was not argued below is implicit in another issue that was argued and is presented by an appeal, we may consider and resolve that implicit issue. *To put it another way, if we must resolve a legal issue that was not raised below in order to*

reach a legal issue that was raised, we will do so.

*Id.* (emphases added) (citations omitted).

Based on the foregoing rationale, because the legal question of whether Petitioners are estopped from challenging the vote as invalid must be addressed in order to reach the central issue on appeal of whether the pricing policy was validly adopted, it is necessary for this court to resolve the estoppel issue in order to reach a proper decision.

## II.

Second, although the estoppel issue was not expressly listed as an error, it was "implicit[ly]" raised, *see Gross*, 2008 WL 5381948, at *2, inasmuch as the voting issue was fully briefed by the parties and decided by the ICA.[1] The majority argues that, because "Petitioners did *not* specifically identify or challenge the [court's] conclusion regarding estoppel[,]" majority on estoppel at 488, 221 P.3d at 466 (emphasis in original), "we (the majority in Part II) are bound by the unchallenged conclusion of law that Petitioners are estopped from challenging the pricing policy vote[,]" *id.* at 495, 221 P.3d at 473. However, as a matter of *fact*, Petitioners did challenge that conclusion inasmuch as they objected to the validity of the vote, the very issue which the court concluded Petitioners were estopped from presenting.

### A.

One of Petitioners' central arguments on appeal was that the pricing policy vote was invalid. By necessary implication, then, Petitioners challenged the court's ruling that they were estopped from disputing that vote. Undeniably, (1) Respondent/Defendant–Appellee Association of Apartment Owners of the Kaanapali Alii (Respondent or the Association) and the ICA addressed this question, (2) neither stated that Petitioners were pre-

1. According to the estoppel majority [hereafter, "the majority"], "fully briefing an issue on the merits that was subsequently decided by the ICA *did not* relieve Petitioners of their burden to challenge the conclusion of law regarding estoppel[,]" and that because Petitioners did not " 'expressly raise' " the estoppel issue, it "was not raised 'as a matter of judicial fact' or 'by necessary implication.' " Majority on estoppel at 488,

221 P.3d at 466 n. 21 (emphasis in original). However, as discussed *infra*, Petitioners did challenge the conclusion of law regarding estoppel because they properly challenged the validity of the vote. Furthermore, it was raised by necessary implication because, as discussed in *Gross, Kramer, Kustura,* and *Belvedere,* this court must address the estoppel issue in order to reach the voting issue.

cluded from raising that argument, (3) Petitioners do not challenge the authority of the Board of the Association (the Board) to adopt a pricing policy, but argue only that the vote was invalid, and (4) Respondent and the ICA did not contend Petitioners were precluded from appealing the invalidity of the vote. In fact, Respondent's apparent view of the court's estoppel ruling was that estoppel did *not* extend to the vote itself.[2] Respondent believed that Petitioners were estopped from "challenging the Board's authority ... to adopt the pricing policy," but Respondent did *not* assert that Petitioners were prevented from arguing the vote itself was erroneous.[3]

The ICA also decided the legality of the vote without objecting that Petitioners had failed to raise the estoppel order.[4] The court's determination that Petitioners were "estopped from challenging ... the adoption of its current pricing policy" was as a matter of judicial fact joined on appeal inasmuch as Petitioners challenged the vote, Respondent responded, and the ICA decided that issue.

Additionally, the only conclusion rendered by the court in regard to the vote was that Petitioners were estopped from challenging it, and thus, by challenging the validity of the vote, Petitioners challenged this conclusion. In their partial summary judgment motion, Petitioners claimed (1) that the pricing policy violated HRS chapter 514C, the Amended Declaration, and the By–Laws because it allowed the Association to realize a profit on the sales of leased fee interests, and (2) that a majority of the Board did not vote to adopt the pricing policy. The court stated five conclusions in its order denying Petitioners' partial summary judgment motion. The court's first four conclusions clearly addressed whether the pricing policy itself, by allowing the Association to make a *profit* on the sales of leased fee interests, violated statutory law, the Amended Declaration, or the By–Laws.

In the court's fifth conclusion, it determined that Petitioners were "estopped from challenging the Association's ... adoption of

2. In a footnote, Respondent stated that,

> as the [court] held, [Petitioners] are estopped from (1) questioning or challenging the Board's authority to exercise the right of first refusal and to adopt the pricing policy, powers granted by the owners and [Petitioners] themselves; (2) asserting that [Respondent's] possession of the remaining leased fee interest was not for [Respondent] as a whole; (3) asserting that the purchase was not under 514C–2, but was instead under 514C–22; (4) objecting to or complaining about how the right of first refusal arose given their vote approving the exercise on the right of first refusal; and (5) *arguing that the Board did not have the authority to establish a pricing policy.*
> (Emphasis added.)

3. The majority argues that "the dissent erroneously suggests" that it was "Respondent's burden to assert that Petitioners were estopped from challenging the validity of the vote[.]" Majority on estoppel at 488, 221 P.3d at 466 n. 21. However, the majority mischaracterizes the statements, *supra*, regarding Respondent's view of the estoppel ruling and fails to cite to where this dissent discusses a purported "burden" on Respondent to assert an estoppel argument. Indeed, the majority cannot, because nowhere is it "suggest[ed]" that Respondent failed to meet such a legal burden. As is clear from the discussion, *supra*, the issue is not whether Respondent met a "burden," but whether it believed that the effect of the court's ruling was to estop Petitioners from challenging the validity of the vote.

Obviously, Respondent did not believe that this was the case.

4. The majority also argues that

> the ICA did not have an obligation to 'object' to or point out, much less address, Petitioner's failure to raise the issue of estoppel, especially in light of the fact that it affirmed the [court's] separate and distinct conclusion that the vote was valid which rendered it unnecessary to address the [court's] conclusion regarding estoppel.

Majority on estoppel at 488–89, 221 P.3d at 466–67 n. 21.

This analysis is flawed for two reasons. First, contrary to the majority's argument, the court did not provide any conclusion regarding the validity of the vote that is "separate and distinct" from the court's conclusion regarding estoppel. Second, as discussed *infra*, the ICA's decision indicates that it determined that Petitioners were not estopped from challenging the validity of the vote, because had it determined that they were, the ICA would not have needed to address the merits of Petitioners' argument. Had the ICA agreed with the court's only conclusion in regard to the vote, *i.e.*, that Petitioners were estopped from challenging the validity of the vote, the ICA would have been "obliged" to express such agreement, because addressing the merits of Petitioners' argument on the vote would have been unnecessary. In this case, however, the ICA did not agree with the court's conclusion, *because it did address the merits of Petitioners' argument.*

its current pricing policy ... as approved by the Board." The majority itself states that it is "bound by the unchallenged conclusion of law that Petitioners are *estopped* from challenging the pricing policy *vote*." Majority on estoppel at 496, 221 P.3d at 474 (emphases added). The estoppel issue thus is intertwined with the subject vote because (1) this is the only court conclusion that addressed the Board's vote, and (2) in that conclusion, the court concluded that Petitioners were estopped from challenging the vote.

The majority claims that this "reasoning is unavailing because ... the [ ] court's denial of Petitioners' motion for partial summary judgment was based on *two independent legal conclusions* regarding the pricing policy vote." *Id.* at 489, 221 P.3d at 467 (emphasis in original). According to the majority the two conclusions were: "(1) the pricing policy ... did not violate Chapter 514C, the amended Declaration, or the By–Laws; and (2) the Petitioners were estopped from challenging the adoption of the pricing policy." *Id.* (quotation marks and brackets omitted). The majority argues that "[i]n [its] view, absent evidence to the contrary, the court's general conclusion that the pricing policy did not violate the By–Laws included the determination that the policy did not violate the voting requirements set forth in the By–Laws[,]" *id.* at 489, 221 P.3d at 467, because the pricing "policy had to be validly adopted in the first instance" before the court could address "whether the substantive provisions of the pricing policy itself were violative," *id.* at 489, 221 P.3d at 467. *This view ignores the plain language of the court's conclusions as well as the arguments made by the parties in their summary judgment motions.*

First, it is evident that the court did not determine whether the vote was valid, because it decided in conclusion no. 5 that Petitioners were "estopped from challenging the Association's ... adoption of its current pricing policy[,]" *i.e.*, estopped from challenging the validity of the vote. Inasmuch as the court decided that Petitioners were estopped from challenging the validity of the vote, there was no logical or legal reason, within the context of the court's September 8, 2005

Order Denying Petitioners' Motion for Partial Summary Judgment, for the court to rule on whether the pricing policy was "validly adopted in the first instance[,]" majority on estoppel at 489, 221 P.3d at 467, as the majority claims.

Second, nothing in the court's second conclusion includes a determination that the vote was valid. Although it references the "pricing policy for the sale of the leased fee interests[,]" the second conclusion does *not* mention the vote taken on the pricing policy. Furthermore, the second conclusion states that the pricing policy did not violate HRS "[c]hapter 514C, the [A]mended Declaration or the By–Laws[.]" Neither HRS chapter 514C, nor the Amended Declaration, have anything to do with voting requirements.

Third, although the By–Laws do establish voting requirements, Petitioners argued in their motion for partial summary judgment that "substantively[,] the Board's pricing policy is illegal" under HRS chapter 514C, the Amended Declaration, and the By–Laws because it allowed the Association to make a profit on the sales of leased fee interests. Similarly, in terms of the Association's ability to make a profit under the pricing policy, Respondent argued in its memorandum in opposition to Petitioners' motion for partial summary judgment that the "pricing policy does not conflict with ... [the] By–Laws." Taken together, these arguments indicate that the court's second conclusion related to the fact that the pricing policy allowed the Association to realize a *profit*, not to the *vote* on the pricing policy.

Fourth, as noted *supra, the ICA fully addressed the validity of the vote without ever mentioning the court's ruling on estoppel.* Therefore, there is nothing in the ICA's Summary Disposition Order that evinces an "apparent view," majority on estoppel at 490, 221 P.3d at 468, that estoppel was separate from the voting issue. Nevertheless, the majority argues that the absence of any estoppel discussion by the ICA "signals [the ICA's] apparent view that [the court's estoppel conclusion] was separate and distinct from the conclusion regarding the validity of the vote[.]" *Id.* To the contrary, the ICA ruled that the abstentions at the January 24,

2004 meeting should not be counted and that, as a result, the pricing policy was passed by a majority of the directors. This confirms that the ICA concluded that Petitioners were *not* estopped from challenging the validity of the vote, *because had it concluded otherwise, there would have been no need for it to address the validity of the vote.* Indeed, the ICA ruled that "the [p]ricing [p]olicy *passed by proper majority," Alvarez,* 2008 WL 4958487, at *1 (emphasis added), proving its understanding that the validity of the vote was to be decided on appeal.

According to the majority, to "assume[ ]" that the ICA "determined that the court's estoppel conclusion was erroneous" but "decided it was unnecessary to articulate such error" "is contrary to the well-settled role of courts to articulate the errors upon which its . . . holdings are based." Majority on estoppel at 483, 221 P.3d at 461. However, the fact that the ICA failed "to articulate" the court's error on estoppel does not demonstrate that it believed the court's estoppel ruling was correct or incorrect. Neither party presented arguments that Petitioners were estopped from challenging the vote on appeal, and therefore, the ICA simply failed to address the issue. But, in addressing the merits of Petitioners' argument as to the vote, the ICA clearly did not consider that Petitioners were estopped from raising the argument.

The majority also argues "there was no need for the ICA to address the court's separate conclusion regarding estoppel" because "the ICA agreed with the court regarding the validity of the vote itself[.]" *Id.* at 483, 221 P.3d at 461. However, as discussed *supra,* the court did not render a conclusion on the "validity of the vote itself," and thus, the ICA could not "agree[ ] with the court" on a non-existent conclusion. Consequently, neither the court's ruling itself, nor the ICA's failure to address the estoppel ruling, support the majority's argument that the voting issue and the estoppel issue are independent of one another.

### B.

The majority cites *Wong v. Cayetano,* 111 Hawai'i 462, 479, 143 P.3d 1, 18 (2006) for the proposition that "all unchallenged conclusions of law are considered binding upon this court." Majority on estoppel at 483, 221 P.3d at 461. But *Wong* is distinguishable inasmuch as the petitioners in that case challenged only the court's conclusion that their claim was barred by *res judicata,* where there were three separate and totally distinct bases upon which the petitioners' claim was denied in the circuit court, none of which related to the *res judicata* claim, and none of which were challenged by the petitioners. *See* 111 Hawai'i at 479–81, 143 P.3d at 18–20. Thus, this court concluded that the circuit court's judgment was supported by those separate and distinct grounds, despite any error in the *res judicata* conclusion. *See id.*

By contrast, as discussed more fully *supra,* in this case, the estoppel issue is not separate and distinct from Petitioners' challenge to the validity of the vote, and, instead, must be reached in order to address the issue of whether the vote was validly counted. *See* discussion, *supra.* Furthermore, unlike in *Wong,* the ICA fully decided the very issue that Petitioners are supposedly estopped from asserting, thereby further placing the court's estoppel conclusion in issue.

In addition to relying on *Wong* for the proposition that unchallenged conclusions are binding on this court, the majority cites to *E & J Lounge Operating Co. v. Liquor Commission of the City & County of Honolulu,* 118 Hawai'i 320, 347, 189 P.3d 432, 459 (2008), and *Association of Apartment Owners of Newtown Meadows ex rel. its Board of Directors v. Venture 15, Inc.,* 115 Hawai'i 232, 167 P.3d 225 (2007), in support of its argument that "where a party does not raise specific issues on appeal to the ICA or on application to this court, the issues are deemed waived and need not be considered." Majority on estoppel at 488, 221 P.3d at 466. However, in *E & J Lounge,* this court applied that basic proposition in discussing certain issues that had been inexplicably raised by the ICA, *but not by the parties or the circuit court.* 118 Hawai'i at 346–47, 189 P.3d at 458–59. Regarding the "waived" issue, this court stated that "[t]his issue *was not raised to the court or the ICA at any stage of the appeal.* Nor was it presented to

this court in the Application. *Moreover, it is inapposite to the disposition herein*[.]" *Id.* at 347 n. 36, 189 P.3d at 459 n. 36 (emphases added). This case is much different in that the estoppel issue was addressed by the court in its ruling, presented to the ICA by Respondent, and is *directly related, and thus apposite, to the disposition herein,* because it directly concerned one of Petitioners' central arguments on appeal.

In *Newtown Meadows,* the circuit court had issued orders granting summary judgment in favor of the appellees on the basis that the appellant's claim was barred by the applicable statute of limitations. 115 Hawai'i at 257, 167 P.3d at 250. On appeal, however, the appellant failed to "assign as error the circuit court's *orders* that granted" the appellees' motions for summary judgment on that basis. *Id.* (emphasis added). By contrast, Petitioners in this case have assigned error to the court's order granting summary judgment in favor of Respondent, which contained the court's estoppel conclusion. Assuming that the appellants in *Newtown Meadows* brought their claims after the time limit set forth by statute, no court would have had the power to hear their claims. In this case, the court's conclusion that Petitioners were estopped from bringing their claims was wrong, and, as discussed at length *infra,* estoppel cannot be used to make an invalid act valid.

Furthermore, the basis for the conclusions in *Wong, E & J Lounge,* and *Newtown Meadows* was Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4). *See E & J Lounge,* 118 Hawai'i at 347, 189 P.3d at 459 (citing HRAP Rule 28(b) for the proposition that "[p]oints not presented in accordance with [HRAP Rule 28] will be disregarded, *except that the appellate court, at its option, may notice a plain error not presented* " and *Sprague v. Cal. Pac. Bankers & Ins. Ltd.,* 102 Hawai'i 189, 195, 74 P.3d 12, 18 (2003) for the proposition that *"[i]t is within the appellate court's discretion whether to recognize points not presented in accordance with HRAP Rule 28(b)(4)."* (emphases added)); *Newtown Meadows,* 115 Hawai'i at 257, 167 P.3d at 250 (citing to HRAP Rule 28(b)(7) for the proposition that "[p]oints not argued may

be deemed waived"); *Wong,* 111 Hawai'i at 479, 143 P.3d at 18 (citing *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 125, 839 P.2d 10, 31 (1992) (citing HRAP Rule 28(b)(4)(C) (1984))). As discussed *infra,* HRAP Rule 28(b)(4) specifically allows this court to address "plain errors not presented," which includes errors of law.

### III.

The anomalous result of the majority's reasoning is that a vote invalid under *Robert's* will be sustained. Despite agreeing that "the pricing policy was not validly adopted[,]" majority on validity of the vote at 476, 221 P.3d at 454, the majority argues that HRS § 514A–82(a)(16) "does not substantively govern the specific actions of the association or board of directors, but instead ... requir[es] that certain provisions be included in an association's by-laws[,]" and, therefore, "an association has lawfully complied with HRS § 514A–82(a)(16) once it has placed a provision in its bylaws ... that 'all association and board meetings shall be conducted in accordance with *Roberts.*' " Majority on estoppel at 493, 221 P.3d at 471 (emphases omitted). That assertion completely undermines the directive in HRS § 514A–82 that association and board meetings be conducted *in accordance with Robert's,* rendering that statute essentially meaningless.

### A.

Respectfully, the majority's position is a patent misinterpretation of HRS § 514A–82(a)(16). The majority agrees that "the ICA erred in holding that the Association's Board validly adopted the pricing policy vote and that summary judgment should have been granted in favor of Petitioners as to the pricing policy vote." Majority on estoppel at 495, 221 P.3d at 473. Yet the majority contradictorily claims that "compliance with HRS § 514A–82(a)(16) is not dependant upon the actions of the Board or whether the Board's action 'complied with the By–Laws as applied pursuant to *Robert's,*' ... but only upon the *contents* of the by-laws themselves." *Id.* at 493, 221 P.3d at 471 (emphases added) (boldfaced emphasis omitted). This is because, according to the majority,

HRS § 514A–82 deals only with the *contents* of association by-laws.

However, to interpret that language as meaning only that an association must place those words in its by-laws, and not that the association shall also *follow* those by-laws, *i.e.,* by conducting its meetings *"in accordance* with the most current edition of *Robert's,"* (emphasis added), is to distort the plain meaning of HRS § 514A–82(a)(16). Requiring associations only to parrot the language of the statute, without actually conducting meetings "in accordance" with *Robert's,* nullifies the statutory command. There can be no conceivable purpose in directing associations to adopt specific requirements in their by-laws, without mandating, as a matter of course, that the association also follow those requirements. Compliance with HRS § 514A–82(a)(16) is dependant upon whether the Board obeyed the direction in the By–Laws as applied to *Robert's,* not on whether the association's By–Laws simply restated the language set forth in the statute without regard to whether meetings were held pursuant to the applicable provisions of *Robert's* or not.

### B.

In relevant part, the Modification Section of *Robert's* states that "[b]y modifying the concepts of a majority vote . . ., other bases for determining a voting result can be defined *and are sometimes prescribed by rule." Robert's* § 44 at 389 (emphasis added). Section 44 addresses the bases for modifying a majority vote, stating that

> [t]wo elements enter into the definition of such bases for decision: (1) the proportion that must concur . . .; and (2) the set of members to which the proportion applies—which (a) *when not stated, is always the number of members present and voting* . . ., *but (b) can be specified by rule as the number of members present*[.]

(Italics in original.) (Emphases added.) As *Robert's* makes clear, under section 44(2)(a), *"when not stated,"* "the set of members to which the proportion applies . . . is always the number of members present and voting[.]" *Id.* (emphasis added). But the Association's By-laws did *state* "the set of mem-

bers to which the proportion applies" as "the number of members *present." Id.* (emphasis added). Thus, as the majority on the validity of the vote *supra* makes clear, through Article IV, Section 9 of the By–Laws, the Association selected the method in section 44(2)(b), under which "the set of members to which the proportion applies . . . can be specified by rule as the number of members *present*[.]" (Emphasis added.)

In this manner, the Association "prescribed by rule" "[an]other bas[i]s for determining a voting result" by adopting a "members present" requirement. The Board, then, was mandated, by virtue of HRS § 514A–82(a)(16), to follow the provision that *Robert's* sets forth when such a "members present" requirement applies—that is, by counting the abstaining members as members present and giving abstentions "the same effect as a negative vote[.]" *Id.* at 390.

However, contrary to *Robert's* and the By-laws, and thus HRS § 514A–82(a)(16), the Board did not count abstaining members as present or assign such members' abstentions a negative vote effect. To argue, as the majority does, that the By–Laws violation did not also constitute a violation of the statute, is to ignore that it is HRS § 514A(a)(16) that commands the By–Laws to include the requirement that *Robert's* be followed, and thus, to negate the public policy reflected on the face of HRS § 514A–82(a)(16) that association meetings be held *in accordance with the relevant provisions in Robert's.* HRS § 514A–82(a)(2) mandates that the by-laws prescribe how binding decisions are to be adopted. The By–Laws in this case indicated that the vote of "a majority of directors *present* " was necessary to take action. To reiterate, under the Modification Section of *Robert's,* this "members present" provision required that all abstaining members be counted as present and be given the same effect as a negative vote. *Roberts* § 44 at 389. As acknowledged by the majority on the validity of the vote, such a provision produces an entirely different result in this case from that reached by the ICA, because the vote on the pricing policy was invalid under both *Robert's* and the By–Laws.

The same distortion infects the majority's argument that "[b]ecause the abstentions were not counted, ... the pricing policy was approved by a majority of the directors *present and voting*," majority on estoppel at 494, 221 P.3d at 472 (emphasis added), which the majority "emphasize[s] is *a* voting method permitted under *Robert's* [,]" *id.* (emphasis added). But simply because a method of voting is described in *Robert's* does not mean that that method is the *correct* manner of voting in this case, *i.e.*, the particular method specified in the Association's own By–Laws. As reiterated *supra*, the Association's By-Laws adopted a "members present" provision, not a "members present *and* voting" provision. Under the majority's approach, *any* voting method would suffice to validate a Board's action, even one invalid under the Association's own By-laws. Only mischief and chaos can result from such an approach.

## IV.

### A.

Third, as Petitioners asserted at oral argument, the court's decision that Petitioners were estopped from raising the validity of the vote obviously raises plain error under HRAP Rule 28(b)(4). With regard to civil cases, this court recognized in *Fujioka v. Kam*, 55 Haw. 7, 9, 514 P.2d 568, 570 (1973), that "the general rule that an appellate court should only reverse a judgment of a trial court on the legal theory presented by the appellant in the trial court ... *is not inflexible and ... an appellate court may deviate and hear new legal arguments when justice requires*." (Citations omitted.) (Emphases added.)

As for the standard to be applied, *Fujioka*, interpreting this court's earlier decisions, set forth a three-factor test, stating that "in the exercise of this descretion [sic] an appellate court should determine [ (1) ] whether the consideration of the issue requires additional facts, [ (2) ] whether the resolution of the question will affect the integrity of the findings of fact of the trial court[,] and [ (3) ] whether the question is of great public import." *Id.* (citations omitted); *see also Oka-*

*da Trucking Co. v. Bd. of Water Supply*, 97 Hawai'i 450, 458–59, 40 P.3d 73, 81–82 (2002) (reiterating the three factors); *State v. Fox*, 70 Haw. 46, 56 n. 2, 760 P.2d 670, 676 n. 2 (1988) (same); *Earl M. Jorgensen Co. v. Mark Const., Inc.*, 56 Haw. 466, 476, 540 P.2d 978, 985 (1975) (applying the test to issue raised *for the first time on appeal from summary judgment which had been "adequately briefed and argued before this court"* as in this case (emphasis added)).

### B.

#### 1.

Here, with regard to the first plain error factor, as in *Fujioka*, "the trial court rendered its judgment on a motion for summary judgment[, and t]hus, ... the resolution of the [estoppel] issue does not require additional facts." *See* 55 Haw. at 9, 514 P.2d at 570. Thus, as the majority concedes, "the first factor of the plain error test is met." Majority on estoppel at 490, 221 P.3d at 468.

#### 2.

As for the second factor, inasmuch as the court's judgment was based on a motion for summary judgment, there were not any "findings of fact" in the traditional sense in this case, and thus, there are no findings whose "integrity" could be affected by an appellate resolution of the estoppel issue. Hence, the second factor *weighs in favor of review*. This conclusion is supported by the history of the test, which reveals that the second factor was intended to caution the appellate court against disturbing the integrity of the fact finding process.

The majority disagrees, averring "that the second factor of the plain error test weighs *against* plain error review if the resolution of an issue would *not* affect the integrity of the findings of fact[.]" *Id.* (emphases in original). Although asserting that "several cases ... support [the majority's] interpretation of the second factor[,]" *id.*, the majority concedes that cases in this jurisdiction, including the case in which the rule originated, *In re Hawaiian Land Co.*, 53 Haw. 45, 53, 487 P.2d 1070, 1076 (1971), have applied the sec-

ond factor in a manner *contrary* to the majority's view, and thus, the majority concludes that "it is evident that this court has inconsistently applied the second plain error factor[,]" majority on estoppel at 491, 221 P.3d at 469. However, the majority "believe[s] it appropriate to leave the definitive interpretation to another day because ... the second factor *does not apply in the context of this case.*" *Id.* (emphasis in original).

Based on a comprehensive review of the development and application of the rule in this jurisdiction, I must respectfully disagree with the majority inasmuch as (1) our courts have consistently applied the second factor as *favoring* appellate review where such review does *not* disturb the integrity of the court's factual findings, (2) the four cases [5] cited by the majority that have applied the second factor differently have applied it in a manner totally divorced from its original purpose and, thus, present an aberration, and (3) under our case law, the second factor weighs *in favor* of review in the summary judgment context because, in such cases, the concern first expressed in *Hawaiian Land Co.*, that the appellate court should be hesitant to affect "the integrity of the fact finding process," 53 Haw. at 53, 487 P.2d at 1076, is absent.

a.

The plain error test originated in *Hawaiian Land Co.* In that case, this court set forth the factors for the first time, along with the rationale supporting each factor. This court believed that the "foremost" consideration was whether appellate review would "attack the integrity of the fact finding process," *id.*, *i.e.*, whether such review would disturb the fact finding process that had occurred in the trial court, such as by requiring a new trial. In setting out what has now become the second factor, this court stated that

[s]everal factors should be considered before exercising the discretion to hear new

issues. Perhaps *foremost is whether the issue goes to the integrity of the fact finding process.* For example, in *Kawamoto v. Yasutake*, 49 Haw. 42, 410 P.2d 976 (1966)[,] *we would not consider an argument on its merits* first raised on appeal because the defendant ragued [sic] prejudicial error emanating from a voir dire question to the jury panel. *If the argument were well founded then a whole new trial would be required.*

*Id.* (emphases added).

Unmistakably then, this court believed that it should exercise restraint where review would dismantle the entire fact finding process. Applying the newly formulated test to the facts of that case, it was concluded that

[a]ll of the above criteria dictate that the interpretation of [HRS] Section 232–3(1) should be considered. Both parties presented extensive evidence and vigorously argued what they felt was the proper valuation of the property thereby fully developing the factual basis. *This issue does not attack the integrity of the fact finding process, but only whether the findings justify lowering the assessment.* Moreover, as it has been noted above, the parties were required to and did submit supplemental briefs and this issue has been fully and ably argued. *Thus, we will consider [HRS] Section 232–3(1).*

*Id.* (emphases added). Hence, in *Hawaiian Land Co.*, review was appropriate because the facts were fully developed, and the appellate analysis would only involve application of HRS § 232–3(1) to the findings that had already been made. The appellate court would not need to engage in any fact finding, nor remand for further factual determinations, and thus, the integrity of the fact finding process was not disturbed. That analysis promotes judicial economy, and recognizes that, generally, the proper role of the appellate court is to decide legal issues on a fully developed record, without disturbing

---

5. Despite the majority's claim, there are actually only three cases in which the second factor is applied contrary to its original meaning, as *Hill v. Inouye*, 90 Hawai'i 76, 976 P.2d 390 (1998), does not refer to the affect on the findings of fact, ·but on the *outcome*, which does not conflict with

the original meaning of the second factor. Whether an error negatively impacted the *outcome* of a case is always a consideration that weighs in favor of plain error review, as it does in the instant case.

the role of the trier of fact in the fact finding process.[6]

Subsequently, in *Fujioka*, although this court slightly reformulated the test as it was expressed in the previous cases, it continued to apply the second factor in the same manner. In that case, the defendants, on appeal from the circuit court's grant of summary judgment, "for the first time attacked the constitutionality of [a] statute" limiting the liability of contractors and engineers. 55 Haw. at 9, 514 P.2d at 569–70. The *Fujioka* court determined that the second factor was not a matter of concern in that case, inasmuch as there were no findings of fact, concluding that

> [h]ere, *the trial court rendered its judgment on a motion for summary judgment. Thus, there is no material fact in issue* and the resolution of the constitutional issue does not require additional facts. *Further*, we believe that the constitutionality of the statute is of great public import, and therefore *we will consider the issue*, though it was raised for the first time before this court.

*Id.* at 9–10, 514 P.2d at 570 (emphases added). Manifestly, this court determined that the fact that on a summary judgment record, "resolution of the question" would not disturb any findings of the court, and, accordingly, no additional fact finding would be necessary, weighed in favor of this court's review, consistent with *Hawaiian Land Co., Greene*, and *Akamine*.

Two years after *Fujioka*, in *Jorgensen*, the test was again applied to an issue raised for the first time on appeal from a motion for summary judgment. In *Jorgensen*, the defendant, a construction company, argued that a limitation of liability clause in a contract should have been voided because of the failure of the plaintiff to perform its part of the bargain. 56 Haw. at 475, 540 P.2d at 985. This court decided to address the issue, *inter alia*, because, pursuant to the second factor, such consideration would "*not* affect the integrity of any findings of fact[,]" stating that

> [w]e have before us *an appeal from a summary judgment. On a motion for summary judgment, the trial court does not try factual issues;* rather, it determines whether there are any such issues to be tried. *The consideration of this issue raised for the first time on appeal will not affect the integrity of any findings of fact of the trial court.* No additional facts are necessary to a determination by this court of this issue.

*Id.* at 476, 540 P.2d at 985 (citations omitted) (emphases added):

To reiterate, the cases wherein this court first introduced the standard expressly held that the goal of the appellate court is *not* to disturb the integrity of the fact-finding process, a role traditionally assigned to the trial court. Thus, as in *Fujioka* and *Jorgensen*, in this case, on appeal from a summary judgment motion, the first two factors weigh in favor of plain error review, inasmuch as "[n]o

6. Following *Hawaiian Land Co.*, this court in *Akamine & Sons, Ltd. v. Hawaii National Bank, Honolulu*, 54 Haw. 107, 115, 503 P.2d 424, 429 (1972), interpreting the "integrity of the fact finding process" factor, held "that *where the issue in question does not go to the integrity of the fact finding process, we should be less hesitant to reverse a trial court judgment based on theory of law* or arguments which may not have been argued before the trial court." (Emphasis added.) Thus, *Akamine* properly recognized that an issue of law, which does *not* affect the integrity of the fact finding process that occurred in the trial court, is an issue appropriate for appellate review.

The next case to apply the test was *Greene v. Texeira*, 54 Haw. 231, 235, 505 P.2d 1169, 1172 (1973), wherein this court formulated the test as three factors which should be considered before allowing a decision on an issue not raised in the opining [sic] brief: (1) *whether the issue*

goes to the integrity of the fact finding process; (2) to what extent an error may have been correctable if properly raised; and (3) whether the issue involves questions of fact that were not but could have been fully developed in the trial court. . . . *If none of these factors are present, it is well within our discretion to hear new legal arguments*, especially if it involves a question of great public import.

(Emphases added.) As to what impact this court's review would have on the fact finding process, this court stated that "[o]verruling [of the precedent at issue] by this court *merely rendered trial of one issue*, that concerning decedent's excess earnings, *superfluous*." *Id.* (emphases added). Thus, the *Greene* court apparently believed its review would only impact the fact finding process minimally, inasmuch as it only rendered the trial of a single issue superfluous.

additional facts are necessary" and "consideration ... will not affect the integrity of any findings of fact[.]" *See id.; see also Cabral v. McBryde Sugar Co.,* 3 Haw.App. 223, 226–27, 647 P.2d 1232, 1234 (1982) (addressing issue of whether the defendant was strictly liable for damages, raised for the first time on appeal, because resolution of the issue by this court would not "affect the integrity of the findings of fact").

b.

Despite the above precedent, the majority argues to the contrary,[7] citing to *Montalvo v. Lapez,* 77 Hawai'i 282, 884 P.2d 345 (1994), *Shanghai Investment Co. v. Alteka Co.,* 92 Hawai'i 482, 993 P.2d 516 (2000), *overruled on other grounds by Blair v. Ing,* 96 Hawai'i 327, 31 P.3d 184 (2001), *Office of Hawaiian Affairs v. State,* 96 Hawai'i 388, 31 P.3d 901 (2001) [hereinafter *OHA* ], and *Hill,* in support of its position. *See* majority on estoppel at 490–91, 221 P.3d at 468–69. The four cases cited by the majority inexplicably departed from the correct application of the second factor, but in subsequent numerous cases, the second factor has been correctly applied as it had been in the numerous preceding cases.

As to *Montalvo,* the defendants argued for the first time on appeal that the trial court had erred in failing to instruct the jury on the definition of "legal cause," because their "entire case hinged on what injury was legally caused by the accident." 77 Hawai'i at

291, 884 P.2d at 354. The second factor was said to weigh in favor of plain error review because "[t]he error ... affect[ed] the integrity of the jury's findings."[8] *Id.* Similarly, in *Shanghai Investment,* the plaintiff argued for the first time on appeal that the court had erred in allowing the defendant to make prejudicial statements during closing argument. 92 Hawai'i at 498, 993 P.2d at 532. This court "decline[d] to notice plain error as to this issue" because "the trial court's refusal to preclude [the defendant's] counsel's commentary ... did not substantially affect the integrity of the jury's findings." *Id.* at 499–500, 993 P.2d at 533–34.

Notably, *Montalvo* applied the second factor in a completely novel manner, contrary to twenty years of prior established precedent, without stating any rationale for such a departure, and without acknowledging that every single prior case had applied the factor in a way that was entirely inconsistent with the approach taken in *Montalvo.* This court's application of the second factor in *Montalvo* and *Shanghai Investment,*[9] which in both cases was done without any analysis or support, represented an anomalous departure from earlier cases. In fact, both cases appeared to be concerned with whether the *outcome* of the case had been affected by the trial court's error, a consideration markedly different from the original purpose behind the second factor as set forth in *Hawaiian Land Co.*[10] Therefore, in relying on *Montalvo*

---

7. The majority's application of its version of the second factor to the instant case demonstrates the fallacy in its reasoning. Here, as the majority concedes, the issue is *purely one of law,* which can be decided based on a factual record that is *undisputed,* without disturbing the fact finding process. Such review is consonant with the proper role of appellate courts to *decide issues of law,* and not to meddle with the court's findings, making review in this case particularly appropriate. To say that instead it would be appropriate for this court to review if facts *were* disputed, thus requiring this court to delve into factual issues or attack findings of fact made below defies logic and is contrary to the appropriately limited role of appellate courts.

8. Thus, it is incorrect to say, as the majority does, that "in *[Montalvo]*, this court reached the opposite conclusion as that set forth in *Hawaiian Land [Co.]* and *Jorgensen,*" majority on estoppel at 490, 221 P.3d at 468, inasmuch as *Montalvo*

was concerned with whether *the error* had affected the integrity, or more aptly, the accuracy, of the jury's findings. Because it appeared that the court's error may have led the jury to *inaccurate* conclusions, this court determined that review was appropriate. As discussed more fully *infra* note 10, this is a type of harmless error analysis. Thus, it is not "oppos[ed]" to *Hawaiian Land Co.,* inasmuch as *Hawaiian Land Co.* was concerned with whether *appellate review* would "attack" the fact finding process that was engaged in by the court below, *not* whether *the error itself* might have caused the jury to reach an incorrect result.

9. It should be noted that neither case involved an appeal from summary judgment.

10. The majority's position reflects that of former Justice Levinson's dissent in *Honda v. Board of Trustees of the Employees' Retirement System of the State,* 108 Hawai'i 212, 242 n. 14, 118 P.3d 1155, 1183 n. 14 (2005) (Levinson, J., dissenting,

and *Shanghai Investment*, the majority's interpretation of the second factor rests on an unexplained and unsupported departure from precedent, for which the majority itself offers no supporting rationale.

The majority also relies on *OHA*, in which the Office of Hawaiian Affairs (OHA) sought a share of the revenue that the State derived from its operation of airport lands held in trust by the State for the benefit of native Hawaiians. 96 Hawai'i at 389, 31 P.3d at 902. The circuit court granted summary judgment in favor of OHA, and, on appeal, the State argued for the first time that a "federal law bar[red] the State from using monies derived from the State's airport system to pay OHA." *Id.* at 396, 31 P.3d at 909. In a footnote, this court stated that "[b]ecause the effect of the [federal law] is purely a question of law, *the outcome of which will affect the integrity of the circuit court's findings of fact,* and is a matter of great public import, we will exercise our discretion in addressing the matter." *Id.* at 396 n. 12, 31 P.3d at 909 n. 12 (emphasis added) (citing *Fujioka,* 55 Haw. at 9, 514 P.2d at 570).

Despite *OHA's* reference to "the circuit court's findings of fact," nowhere in the remainder of the opinion are any findings by the circuit court discussed. Indeed, because *OHA* involved an appeal from the circuit court's grant of summary judgment, it is not clear whether the circuit court made any findings. Thus, this court's application of the test in *OHA* offers no ascertainable standard or guidance on how to apply the factors in this case. Furthermore, like *Fujioka* and *Jorgensen, OHA* involved an appeal from the circuit court's grant of summary judgment in which this court, applying the test, reviewed an argument raised for the first time under the plain error doctrine.

As to *Hill,* in that case the family court refused to grant a temporary restraining order (TRO) after applying HRS § 586–4, "which requires a showing of recent acts of abuse" rather than HRS § 586–3, which does not require such a showing. 90 Hawai'i at 77, 976 P.2d at 391. The plaintiff argued for the first time on appeal that the family court improperly required her to show recent acts of abuse. *Id.* at 82, 976 P.2d at 396. This court decided to address the issue because (1) "additional facts [were] not required ... [,] [ (2) ] *our discussion ... directly affects the family court's outcome in this case,* and [ (3) of] the importance of petitions for pro-

joined by Moon, C.J.), which stated that "this court has inconsistently applied the second [ ] factor." In accord with *Montalvo* and *Shanghai Investment,* Justice Levinson believed that the second factor should be directed toward whether the *error* itself negatively impacted the court's "findings" because "it would be illogical to notice plain error that would not affect the integrity of the trial court's [findings of fact], inasmuch as *such error would be harmless." Id.* (emphasis added).

But the harmless error test is not concerned with whether the error affected findings of fact. To the contrary, where the trial court erred in making a factual finding, generally the appellate court will affirm, unless such error had an affect on the *outcome.* See, e.g., *Kawamata Farms, Inc. v. United Agri Prods.,* 86 Hawai'i 214, 243, 948 P.2d 1055, 1084 (1997) (holding that "even when a trial court abuses its discretion in a civil trial by giving the jury an inappropriate remedial instruction, we will nevertheless affirm the jury's verdict when it appears from the record as a whole that it is not reasonably likely that an outcome more favorable to the defendant would have resulted absent the error"); *Wright v. Wright,* 1 Haw.App. 581, 584, 623 P.2d 97, 100 (1981) ("While we agree that ... the finding ...

is clearly erroneous, we do not think that reversal is required. Erroneous findings of fact that are unnecessary to support the decision and judgment of the trial court are not grounds for reversal."). Thus, Justice Levinson's statement of harmless error was incorrect.

However, it is useful to view the application of the second factor in *Montalvo* and *Shanghai Investment,* as well as *Hill,* as a form of harmless error analysis, inasmuch as in those cases, the question could be properly stated as whether the error potentially impacted the *outcome* in the case and thus, was not harmless. While whether the error is harmless may be an appropriate consideration in determining whether to review for plain error, it is a *totally separate and distinct consideration* from that embodied in the second factor, as it was originally set forth in *Hawaiian Land Co.,* and has been affirmed many times since. The second factor does not focus on whether the error was harmless, but is concerned with preserving the proper role of an appellate court, to exercise restraint in determining whether to disturb a trial court's findings of fact. Thus, while the consideration of harmless error in the aforementioned cases was not necessarily inapposite to the determination of whether plain error should be noticed, it did not represent a sound application of the second factor.

tection from domestic abuse[.]" *Id.* (emphasis added).

The majority's reliance on *Hill* is plainly incorrect, inasmuch as *Hill* actually supports review for plain error in the instant case. Assuming, *arguendo*, that *Hill's* point (2) is an interpretation of the second factor, it means that the plain error doctrine should be applied if this court's discussion will "directly affect[ ] the [court's] outcome in this case." *Id.* Clearly, this court's discussion of the Board's vote will have a direct effect on the outcome of this case, because, as noted in the majority on the validity of the vote, summary judgment should have been granted in favor of Petitioners. Thus, assuming that *Hill's* interpretation of the second factor is correct, the second factor weighs in favor of plain error review.

In sum, the cases cited by the majority represent an unexplained departure from the fundamental purpose of the rule as set forth in *Hawaiian Land Co.* and expressed in *Fujioka.* The majority does not attempt to offer any rationale to support its conclusion that the interpretation of the factor as it was applied in only a few cases is the better rule, as opposed to the numerous cases that have followed the original application of the standard.

### c.

Furthermore, contrary to the majority's claim regarding this court's "inconsistent[ ] appl[ication]" of the second factor, this court, along with the ICA, and even other courts, has in fact consistently applied the second factor, as it was set forth in *Hawaiian Land Co. See, e.g., Paul v. Dep't of Transp., State of Hawai'i,* 115 Hawai'i 416, 428, 168 P.3d 546, 558 (2007) (concluding that the first two factors were met, but the third was not, stating that "[the petitioner's] argument . . . does not necessitate any additional fact-finding on this court's part, and our resolution of it will not affect the integrity of the findings of fact of the [circuit] court, [b]ut neither is the question of great public import" (internal quotation marks and citation omitted)); *State v. Hicks,* 113 Hawai'i 60, 74–75, 148 P.3d 493, 507–08 (2006) (concluding that "[a]lthough this court's consideration of the constitution-

ality of the sexual assault statutes would not (1) require additional facts or (2) affect the integrity of any factual findings of the trial court," declining review because "we have considered the constitutionality of HRS § 707–700 on the grounds of vagueness or overbreadth" in the past); *In re Waikoloa Sanitary Sewer Co.,* 109 Hawai'i 263, 276, 125 P.3d 484, 497 (2005) (concluding that "[r]esolution of [the a]ppellant's miscalculation issue for the first time on appeal would compromise the integrity of the Commission's previously rendered findings and therefore weighs against this court's recognition of plain error"); *Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co.,* 100 Hawai'i 97, 107–08, 58 P.3d 608, 618–19 (2002) (citing *Fujioka* as demanding consideration of "whether the resolution of the question will affect the integrity of the findings of fact of the trial court" and declining to review because "[u]nlike *Fujioka,* full consideration of the [issue] raised by [the appellant] in this appeal will require additional facts, as illustrated by the fact that [the appellant] itself relied on evidence adduced [subsequent to summary judgment] to present its argument on appeal"); *Birmingham v. Fodor's Travel Publ'ns, Inc.,* 73 Haw. 359, 372 n. 7, 833 P.2d 70, 77 n. 7 (1992) (concluding that "[b]ecause the determination of the strict liability claim requires no additional facts, the trial court rendered no findings of fact, and the issue is one of first impression in this jurisdiction, we would be justified in addressing this issue on appeal even if it had not been raised in the court below"); *Jorgensen,* 56 Haw. at 475–76, 540 P.2d at 985; *Fujioka,* 55 Haw. at 9, 514 P.2d at 570; *Greene,* 54 Haw. at 235, 505 P.2d at 1172; *Akamine,* 54 Haw. at 115, 503 P.2d at 429; *Right to Know Comm. v. City Council, City & County of Honolulu,* 117 Hawai'i 1, 14, 175 P.3d 111, 124 (App.2007) (noticing plain error because the "[p]laintiffs' request . . . calls for no additional facts[, r]esolving this question will not affect the integrity of the findings of fact of the circuit court, and the question is of great public import"); *State v. Kapela,* 82 Hawai'i 381, 392, 922 P.2d 994, 1005 (App.1996) (concluding that "[b]ecause the determination of [the d]efendant's challenge to the constitutionality of HRS § 709–906 does not involve any ma-

terial factual issue, and the constitutionality of the statute against domestic violence is of great public import, we will consider [the d]efendant's claim even though it was raised for the first time before this court"); *Hong v. Kong*, 5 Haw.App. 174, 177, 683 P.2d 833, 837 (1984) ("Here, consideration of the new issue will affect the integrity of the findings of fact.... The new issue, furthermore, is of no great public import. Consequently, we exercise our discretion and decline to consider the issue"); *Cabral*, 3 Haw.App. at 226–27, 647 P.2d at 1234 (stating that "[i]n deciding whether justice requires otherwise, we are required to determine whether consideration of the issue requires additional facts, whether the resolution of the question will affect the integrity of the findings of fact, and whether the question is of great public import[,]" and that "[i]n this case we answer the questions no, no, and yes, respectively, and hold that justice requires us to consider the strict liability issue" (citation omitted)); *Scheid v. State Bd. of Tax Comm'rs*, 560 N.E.2d 1283, 1285–86 (Ind.Tax 1990) (citing *Hawaiian Land Co.* as stating that "[p]erhaps foremost is whether the issue goes to the integrity of the fact finding process[,]" and declining to review the issue, *inter alia*, because "[i]t is the integrity of the process by which these facts were found, rather than the facts themselves, with which this court is concerned").

Opposed to the majority's claim, then, the overwhelming weight of authority, both past and recent, has interpreted the second factor consistently with the principles originally set forth in *Hawaiian Land Co.*, and, thus, the four cases cited by the majority which interpret it differently are an inexplicable aberration.

d.

In spite of the majority's "belie[f]" as to the second factor of the plain error test noted above, the majority ultimately concludes that "the second factor *does not apply in the context of this case.*" Majority on estoppel at 491, 221 P.3d at 469 (emphasis in original). The majority relies on Justice Levinson's dissent in *Honda*, in which Justice Levinson ruminated at length on this court's application of the second factor. *See Honda*, 108 Hawai'i at 242, 118 P.3d at 1183

(Levinson, J., dissenting, joined by Moon, C.J.). Justice Levinson claimed that *Jorgensen* and *Fujioka* "involved appeals from orders granting summary judgment, there were no [findings] in those cases and the second prong of the Fujioka test did not apply." *Id.*

However, Justice Levinson in *Honda* and the majority in this case ignore the fact that *neither Jorgensen nor Fujioka held that the second factor "did not apply." Instead, in both cases, this court determined that the second factor weighed in favor of plain error review precisely because they involved motions for summary judgment.* In *Jorgensen*, this court decided to hear an issue raised for the first time on appeal, *inter alia*, because the case involved "an appeal from a summary judgment," and "[t]he consideration of th[e] issue ... [would] *not* affect the integrity of any findings of fact of the trial court". 56 Haw. at 476, 540 P.2d at 985 (emphasis added). Similarly, *Fujioka*, in applying the plain error test and addressing an issue not raised in the trial court, noted that "the trial court rendered its judgment on a motion for summary judgment[,]" and "[t]hus, there [was] *no material fact in issue* and the resolution of the [ ] issue d[id] not require additional facts." 55 Haw. at 9, 514 P.2d at 570 (emphasis added).

Like *Jorgensen* and *Fujioka*, this case involves an appeal from a summary judgment ruling. Therefore, contrary to the majority's assertion that the second factor is inapplicable, by applying the policy behind the second factor set forth in *Hawaiian Land Co.*, and reiterated in *Jorgensen* and *Fujioka*, as well as numerous subsequent cases, it is apparent that *the second factor weighs in favor of plain error review in this case*, because, in the summary judgment context, appellate review does not "attack the integrity of the fact finding process," *Hawaiian Land Co.*, 53 Haw. at 53, 487 P.2d at 1076, or "affect the integrity of the findings of fact of the trial court," *Fujioka*, 55 Haw. at 9, 514 P.2d at 570.

3.

a.

As for the third factor, the legislature has dictated that *Robert's* should apply to condo-

minium association voting requirements. Consequently, the court's estoppel conclusion was wrong inasmuch as Petitioners cannot be estopped from challenging a vote that was unlawful, merely because they agreed that the Board had *authority* to set the pricing policy. In this case, the Board's vote, under HRS § 514A–82(a)(16), the By–Laws, and *Robert's, did not in fact authorize* the current pricing policy, *but rejected its adoption.* Therefore, by disputing the improper vote, Petitioners were not challenging the Board's authority, but in fact upholding it, by enforcing the requirement in the By–Laws, as applied under HRS § 514A–82(a)(16), that a majority of the Board members *present* vote in favor of the policy.

Hence, to uphold HRS § 514A–82(a)(16), this court must notice the court's error on the estoppel issue. The court's mistake was one of law, inasmuch as the court incorrectly applied the estoppel doctrine, and foreclosed Petitioners from challenging an illegal action—a prohibited application of the estoppel principle. *See* discussion *infra.* The majority disagrees, concluding that Petitioners' "right to contest the validity of the Board's voting procedure does not constitute a matter of 'public interest' because (1) such right is of a private nature and (2) the issue applies exclusively to the facts and circumstances of Petitioners' case." Majority on estoppel at 492, 221 P.3d at 470. Additionally, the majority argues that "the court's conclusion of law regarding estoppel was applicable exclusively to Petitioners because it was based upon their individual acquiescence to the amendment to the Declaration." *Id.*

b.

In *Jorgensen,* this court reviewed the issue because it was "one of first impression in this

jurisdiction, and call[ed] for the interpretation and elucidation of HRS [§ ]490:2–719(2)." 56 Haw. at 476, 540 P.2d at 985; *see also Greene,* 54 Haw. at 235, 505 P.2d at 1172 ("The great importance to the public of a proper interpretation of Hawaii's Survival Statute is obvious."). Similarly, in this case, the proper interpretation of HRS § 514A–82(a)(16) is a matter of great public importance, one of first impression, and a matter upon which the majority agrees that the ICA gravely erred.

The majority's estoppel ruling extends beyond "Petitioners' case." HRS § 514A–82(a)(16) and *Robert's* apply not only in this case, but to all Associations of Apartment Owners and their governance. Allowing the resulting vote to stand conflicts with HRS § 514A–82(a)(16), and generally sanctions estoppel as an override of statutorily mandated voting procedures. The majority's holding prevents Association of Apartment Owners (AOAO) members from challenging the illegal action of an AOAO. As a result, estoppel undermines the public policy in HRS chapter 514A of fostering the orderly and fair disposition of controversies in the large number of AOAO communities, in accordance with *Robert's*.[11] *See White Egret Condominium, Inc. v. Franklin,* 379 So.2d 346, 350 (Fla.1979) ("Condominium unit owners comprise a little democratic sub society of necessity more restrictive as it pertains to use of condominium property than may be existent outside the condominium organization." (Citation omitted)); *Thanasoulis v. Winston Towers 200 Ass'n,* 110 N.J. 650, 542 A.2d 900, 903 (1988) ("One aspect of condominium ownership that distinguishes it from other types of property interests, however, is the role of the condominium association.... In essence, an association is responsible for the governance of the

---

11. According to the majority, *"no other AOAO community* will be negatively impacted by our holding" as to the estoppel issue because it is "exclusive to the distinct facts and circumstances of the present case." Majority on estoppel at 492, 221 P.3d at 470 (emphasis in original). This is plainly wrong. Permitting the court's erroneous conclusion of law to stand in this case will frustrate the public policy in HRS chapter 514A regarding the efficacy of *all* AOAO by-laws.

For example, in *Hill,* this court reviewed the plaintiff's contention that the family court erred

in applying a particular statute to the decision of issuing a TRO because of "the importance of petitions for protection from domestic abuse[.]" 90 Hawaiʻi at 82, 976 P.2d at 396. In *Hill,* upholding the family court's erroneous application of the statute would have undermined the public policy of protecting victims from abuse. Similarly, and inconsistent with *Hill,* the majority permits the court's erroneous estoppel ruling to abrogate the public policy in favor of the ordered disposition of controversies as set forth in HRS chapter 514A.

common areas and facilities.... It is a representative body that acts on behalf of the unit owners."); *Levandusky v. One Fifth Ave. Apartment Corp.,* 75 N.Y.2d 530, 554 N.Y.S.2d 807, 553 N.E.2d 1317, 1320 (1990) ("As courts and commentators have noted, the cooperative or condominium association is a quasi-government-a little democratic sub society of necessity.... Like a municipal government, ... governing boards [of AO-AOs] are responsible for running the day-to-day affairs of the cooperative....") (Internal quotation marks and citation omitted.)).

Permitting the invalid pricing policy to remain uncorrected, means for all AOAOs (1) that HRS § 514A–82, "Contents of bylaws," is superseded by the estoppel doctrine, and (2) HRS § 514A–82(a)(16) has little impact on the governance of AOAOs, inasmuch as, under the majority's formulation, AOAOs need only repeat the words of the statute in their by-laws, but *not* actually follow those provisions. Hence, although this court, in the majority on the validity of the vote, holds that the pricing policy was not validly adopted under the By–Laws, the majority completely undermines that holding by ignoring it in the majority's section on estoppel. Thus, the majority's ruling calls into question the viability of all AOAO bylaws, by sustaining a violation of HRS § 514A–82(a)(16).

### C.

The error of rejecting plain error review is compounded since no prejudice would result to either side by noticing plain error. There is no prejudice to Respondent, inasmuch as Respondent had ample opportunity to assert estoppel against Petitioners on appeal, but it did not. As explained *supra,* Respondent in fact did not interpret the court's estoppel conclusion as preventing Petitioners from arguing that the vote was unlawful. Petitioners represented at oral argument that they were also under the same impression, and did not believe they were precluded by the

court's estoppel conclusion from arguing the validity of the Board's vote. Additionally, the voting question was already the subject of "legal inquiry and research" as "presented and argued by the parties" before the ICA and this court. *See Ford v. United States,* 533 A.2d 617, 624 (D.C.1987); *Hawaiian Land Co.,* 53 Haw. at 53, 487 P.2d at 1076 (reviewing the error for the first time on appeal because "[b]oth parties presented extensive evidence and vigorously argued what they felt was the proper valuation of the property thereby fully developing the factual basis[,]" and "this issue has been fully and ably argued"). For that reason it is incumbent upon this court to grant plain error review because all three prongs for such review are satisfied. *See, e.g., Hawaiian Land Co.,* 53 Haw. at 53, 487 P.2d at 1076.

### V.

Fourth, the court's estoppel ruling is wrong as a matter of law, because, although Petitioners agreed to the Board's *authority* to establish the sales price for the properties, they cannot be legally precluded from appealing a vote that is violative of both the By–Laws and HRS § 514A–82(a)(16).[12] The court's and the ICA's holding to the contrary left Petitioners at the mercy of a vote that is a nullity, as recognized by the majority.

### A.

#### 1.

Our precedent dictates that the equitable doctrine of estoppel cannot be used to prevent a party from challenging an illegal act. In *Godoy v. Hawaii County,* 44 Haw. 312, 354 P.2d 78 (1960), the plaintiff bus operator had agreed to an arrangement passed by the defendant Bus Control Committee, called the Mabuni Plan, and this court therefore concluded that he was estopped "from maintaining that he was overcharged [under the plan] by the committee." *Id.* at 318, 354 P.2d at

---

**12.** According to the majority, "even if the [court's] estoppel ruling was 'wrong as a matter of law,' ... any view as to the correctness or incorrectness of the [court's] ruling is irrelevant" because it is "bound by the standard for invoking plain error *sua sponte.*" Majority on estoppel at

493, 221 P.3d at 471 n. 23. In this case, as discussed at length *supra,* the test weighs in favor of plain error review, and thus, the fact that the court's estoppel ruling was wrong as a matter of law is directly relevant, inasmuch as that is the decision this court should review for plain error.

81. The plaintiff had taken advantage of a reduction in operating costs, and was in fact "in favor of and urged the adoption of the Mabuni Plan[,]" and therefore he was estopped from subsequently challenging the same plan.[13] *Id.*

*Godoy* recognized that "estoppel cannot make valid that which the [c]onstitution and laws of a state make absolutely invalid." *Id.* at 324, 354 P.2d at 84. In *Godoy*, this court concluded that this rule was not violated, as it *"does not cover the kind of situation* we have in this case, *where the purported illegality consists only of a lack of authority* in the Bus Control Committee to fix the rate for parking fees." *Id.* (emphases added). However, *Godoy* declared that where instead the issue asserted is a "violation of a decisive prohibition of statute[,]" estoppel cannot be invoked. *See id.*

### 2.

The rule that "estoppel cannot make valid that which the ... laws of a state make absolutely invalid[,]" *id.* (internal quotation marks and citation omitted), was not applied in *Godoy*. Several other courts, however, have affirmed the proposition in *Godoy* that "[n]ot even estoppel can legalize or vitalize that which the law declares unlawful and void," *id.* (citations omitted), under circumstances where the proposition was applied.

For example, the Massachusetts Supreme Court in *Commissioner of Banks v. Cosmopolitan Trust Co.,* 253 Mass. 205, 148 N.E. 609 (1925), held that estoppel could not be used to "give validity to shares" of stock, where the "corporation [was] absolutely without power to increase its capital stock," concluding that

> *[a]cquiescence cannot clothe with legality a positively illegal act. One cannot ordinarily be estopped to assert the direct violation of a decisive prohibition of statute* or the unenforceability of a contract contrary to law. *When a corporation is absolutely without power to increase its capital*

> *stock, acquiescence cannot give validity to shares nor bind an apparent holder of such stock to the liabilities of a genuine stockholder.*

> A distinction must be made between shares which the company had no power to issue and shares which the company had power to issue, although not in the manner in which, or upon the terms upon which, they have been issued. *The holders of shares which the company has no power to issue, in truth had nothing at all,* and are not contributors.

*Id.* at 614 (citations omitted) (emphases added). As in *Commissioner of Banks,* in this case, Petitioners' "acquiescence" in the amendment to the By–Laws authorizing Respondent to set a pricing policy did not "give validity to" a vote that was absolutely void, inasmuch as the Board was "without power" to set a pricing policy absent a valid majority.

Similarly, in *Appon v. Belle Isle Corp.,* 46 A.2d 749, 760 (Del.1946), the Delaware Supreme Court addressed the question of whether "the[ ] two defenses [of unclean hands and estoppel] ... preclude the complainants from attacking the legality of the May 27 agreement on the ground that it violates Section 18 of the General Corporation Law of Delaware." That court concluded that those defenses could not preclude attack on the agreement as illegal, stating that

> [i]f the public policy of the state as it is incorporated in a statute will be frustrated by denying relief, based for instance on the defense of the clean hands doctrine, the court will not apply the doctrine.... *The equitable rule* that he who comes into equity must come with clean hands *has no application where its enforcement would result in maintaining an act declared by statute to be void or against public policy. The same rule applies to estoppel.*

*Id.* at 760 (citations omitted) (emphases added). According to that court, because the

---

**13.** It could be argued that, under *Godoy*, Petitioners are estopped from challenging Respondent's vote setting the pricing policy because they were in favor of the amendment which allowed Respondent to set prices. However, *Go-* *doy* is distinguishable in that the plaintiff had specifically urged the adoption of the very plan he then challenged, whereas Petitioners here never voted in favor of the particular pricing policy adopted.

"public policy of the State" with respect to voting trusts was expressed in the statute, it must "set aside [the] agreement" as violative of the statute, despite "facts which would otherwise justify an estoppel":

It would appear, therefore, that *the public policy of the State of Delaware towards voting trusts is incorporated in Section 18 and this public policy would be frustrated in part if a court were to prevent a person otherwise having a proper standing to complain from asserting that a particular voting trust agreement violates Section 18 because ... there are facts which would otherwise justify an estoppel.* While it is evident that in such a situation the court is met with two conflicting policies, nevertheless, *the courts resolve the conflict in favor of the public policy of the state as set forth in the statute and set aside an agreement in violation thereof.*

*Id.* at 761 (emphases added). Thus, *Appon* concluded that "because the complainants are attacking the legality of an agreement which violates the public policy of the state, as reflected by Section 18, they may not be prevented from asserting such illegality because of the existence of facts which would otherwise call for the application of ... estoppel[,]" and thereby held "that the agreement of May 27 is a legal nullity[.]" *Id.*

### B.

Analogously, in this case, the legislature adopted a policy in HRS § 514A–82(a)(16) of requiring that AOAO by-laws apply *Robert's* to conduct meetings. Respondent itself opted in its By–Laws to adopt specific voting requirements. In this case, the vote is "declared by statute [and the By–Laws] to be void." Thus, to confirm the invalid vote by the Board would contravene the policy embodied in HRS § 514A–82(a)(16). *See also Tobacco By–Prods. & Chem. Corp. v. W. Dark Fired Tobacco Growers Ass'n,* 280 Ky. 469, 133 S.W.2d 723, 726 (App.1939) (holding that a court may not "clothe with legality a contract that is absolutely illegal and void even by the application of the doctrine of equitable estoppel. If through the application of that doctrine courts can bring about a result expressly forbidden by constitution and statute on the ground of public policy, *then estoppel does what public policy and the law has forbidden*" (emphasis added)); *State v. Nw. Magnesite Co.,* 28 Wash.2d 1, 182 P.2d 643, 656 (1947) ("It follows, from what we have said, that the promise or 'agreement' of 1934 was not authorized by our statutes then in force, and was indeed contrary to the policy of those legislative enactments, and, hence, was illegal. *The contract being illegal, the respondents may not invoke the doctrine of estoppel to enforce it.*" (Emphasis added.)).[14]

### C.

The majority claims that "there was no violation of a statute or constitutional provision of law in the instant case[,]" majority on estoppel at 495, 221 P.3d at 473, inasmuch as "it cannot be said ... that the pricing policy vote was unlawful under HRS § 514A–82," *id.* at 494, 221 P.3d at 472, "the pricing policy vote was conducted in accordance to *Robert's,*" *id.* at 494, 221 P.3d at 472, and "the By–Laws themselves complied with HRS § 514A–82(a)(16)," *id.* at 494, 221 P.3d at 472. As discussed more fully *supra,* that argument is groundless, because HRS § 514A–82 is intended to apply to the "[c]ontents of bylaws" and HRS § 514A–82(a)(16) dictates that *Robert's* applies. In accordance with the By–Laws that adopted a "members pres-

**14.** American Jurisprudence has distilled the concept from the above-cited cases, explaining that *certain considerations of public policy are properly invoked to prevent the application of the rule of estoppel.* For example, an estoppel may not be raised against a state if the application thereof will result in impeding the administration of the government or prevent the exercise of the police power of the state. *Estoppel cannot,* any more than private contract, *be the means of successfully avoiding the requirements of legislation enacted for the protection of a* public interest. *It does not operate to defeat positive law or public policy. Therefore, substantive rules based on public policy sometimes control the allowance or disallowance of estoppel. The courts must weigh the public interest frustrated by the estoppel against the equities of the case. Moreover, one cannot ordinarily be estopped to assert the direct violation of a decisive prohibition of statute or the unenforceability of a contract contrary to law.*

28 Am.Jur.2d *Estoppel and Waiver* § 32, at 462 (2000) (emphases added).

ent" provision, the vote was invalid under the Modification Section of *Robert's*, and therefore, also invalid under HRS § 514A–82. Hence, the majority is simply wrong in arguing that allowing the vote to stand would not "frustrate the policy embodied in Chapter 514A." *Id.* Based on its reading of HRS § 514A–82(a)(16), the majority concludes that "any further reference to HRS § 514A–82— specifically, subsection (a)(16),—for the purpose of determining whether a board complied with its by-laws and conducted its meetings in accordance with *Robert's* is unnecessary." *Id.* at 494, 221 P.3d at 472. To the contrary, it is *because* of the statutory requirement embodied in HRS § 514A–82(a)(16) that the By–Laws require that meetings be conducted in accordance with *Robert's*. Thus, whether the Board's meeting in fact complied with the By–Laws and *Robert's* is directly relevant to whether the Association complied with HRS § 514A–82(a)(16). It would be legally absurd to construe the statute as containing only empty requirements; instead, those requirements must in fact be applied. *See County of Hawai'i v. C & J Coupe Family Ltd. P'ship,* 119 Hawai'i 352, 362, 198 P.3d 615, 625 (2008) ("The canons of statutory construction [ ] require this court to construe statutes so as to avoid absurd results." (Internal quotation marks and citation omitted.))

For this reason, the majority's attempt to distinguish *Commissioner of Banks, Appon,* and *Tobacco By–Products* from the instant case on the basis that "[i]n each of these cases, there was a clear violation of a constitutional or statutory provision[,]" majority on estoppel at 495, 221 P.3d at 473, is mistaken. As discussed above, by failing to apply the correct *Robert's* provision as dictated by the By–Laws, the Board violated HRS § 514A–82(a)(16). Thus, like those cases, the application of estoppel in this case, which allows the Board to violate HRS § 514A–82(a)(16), will frustrate the public policy establishing uniform governing procedures for AOAOs in HRS chapter 514A. In sum, estoppel cannot

be used to prevent Petitioners from challenging a vote that was unlawful under a state statute, because otherwise "estoppel does what the public policy and the law has forbidden." *Tobacco By–Prods.,* 133 S.W.2d at 726.

### VI.

For the foregoing reasons, the ICA's grave error as to the validity of the vote on the pricing policy should be reversed, the court's judgment vacated and the case remanded.[15]

---

**15.** Inasmuch as I would vacate and remand the court's decision on the basis that the Board's vote did not validly adopt the pricing policy, I do not reach the questions of whether the pricing policy violates the By–Laws or HRS chapter 514C. Additionally, because summary judgment should have been entered in favor of Petitioners on the issue of the Board's vote, I would vacate and remand for a redetermination of the court's award of attorney's fees and costs.